Filed:  March 13, 2002

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

Nos. 99-2494(L)
(18-CA-13394, et al.)

Overnite Transportation Company,

Petitioner,

versus

National Labor Relations Board,

Respondent.

O R D E R

The court amends its opinion filed February 11, 2002, as follows:

On page 28, line 6 after first indented quotation -- the citation for <u>So-Lo Foods</u> is corrected to begin "985 F.2d 123."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

OVERNITE TRANSPORTATION COMPANY,
    *Petitioner,*

    v.

NATIONAL LABOR RELATIONS BOARD,       No. 99-2494
    *Respondent,*

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS,
    *Intervenor.*


NATIONAL LABOR RELATIONS BOARD,
    *Petitioner,*

    v.

OVERNITE TRANSPORTATION COMPANY,       No. 00-1065
    *Respondent,*

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS,
    *Intervenor.*


On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board.
(18-CA-13394, 18-CA-13481, 18-CA-13642, 18-CA-13394,
18-CA-13438, 18-CA-13484, 18-CA-13394-51, 18-RC-15812,
18-CA-15812, 18-CA-13394-35, 18-CA-13395-36, 9-CA-33793,
18-RC-15814, 18-CA-13394-27, 8-RC-15786, 18-RC-15782,
18-CA-13394-91, 18-CA-13394-13, 18-RC-15768, 18-CA-13916,
4-RC-18747, 5-RC-14213, 9-RC-16504, 9-RC-16505)

Argued: September 25, 2001

Decided: February 11, 2002

Before WILKINSON, Chief Judge, and WIDENER, WILKINS, NIEMEYER, LUTTIG, WILLIAMS, MICHAEL, MOTZ, TRAXLER, KING, and GREGORY, Circuit Judges.

_____

By published opinion, petition for review granted in part and denied
in part, cross-application for enforcement denied to the extent incon-
sistent with the opinion, and case remanded for reelections at four
sites. Judge Niemeyer wrote the opinion, in which Chief Judge Wil-
kinson and Judges Widener, Wilkins, Luttig, Williams, and Traxler
joined. Judge Gregory wrote a separate opinion concurring in part and
dissenting in part. Judge King wrote a dissenting opinion, in which
Judge Michael and Judge Motz joined.

_____

## COUNSEL

**ARGUED:** Kenneth T. Lopatka, MATKOV, SALZMAN, MADOFF & GUNN, Chicago, Illinois, for Overnite. William M. Bernstein,
Senior Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board. Carey Robert Butsavage, BUTSAV-
AGE & ASSOCIATES, P.C., Washington, D.C., for Intervenor. **ON BRIEF:** Kenneth F. Sparks, Christopher A. Johlie, MATKOV, SALZMAN, MADOFF & GUNN, Chicago, Illinois, for Overnite. Leonard R. Pate, General Counsel, Linda Sher, Associate General
Counsel, Aileen A. Armstrong, Deputy Associate General Counsel,
NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board. Marc A. Stefan, BUTSAVAGE & ASSOCIATES, P.C., Washington, D.C., for Intervenor.

_____

## OPINION

NIEMEYER, Circuit Judge:

In this case, we decide whether, under the principles of *NLRB v. Gissel*, 395 U.S. 575 (1969), the National Labor Relations Board properly ordered a company to bargain with a union that did not win its representation election.

In the fall of 1994, the International Brotherhood of Teamsters, AFL-CIO, and its affiliated locals ("Teamsters") began a nationwide campaign to organize the employees of Overnite Transportation Company, headquartered in Richmond, Virginia. At that time, Overnite was one of the nation's largest nonunion trucking companies, with approximately 175 service centers across the country and approximately 14,000 employees.

In its campaign, the Teamsters promised Overnite employees that union representation would bring a new golden age, when the employees would have the benefit of the National Master Freight Agreement and would receive wage increases of more than $2.50 per hour, larger pensions, less expensive and more comprehensive medical benefits, and more favorable work rules. While Overnite observed that such a pay package would cost an amount that exceeded the sum of its profits, it nevertheless sought to portray a bright future without union representation under the leadership of its new president, Jim Douglas. Perhaps to provide a glimpse of that bright future, Overnite announced, during the heated campaign, a national pay increase.

The Teamsters' efforts led to elections at numerous Overnite service centers in 1995. In connection with those elections, the Teamsters filed complaints of unfair labor practices against Overnite, and, at 17 locations where the union lost, rather than seek new elections, the Teamsters sought orders directing Overnite to bargain with the union, based on *NLRB v. Gissel*.

The numerous proceedings before the National Labor Relations Board ("Board") were consolidated into one massive proceeding. Some elections were certified, and issues relating to others were set-

3

tled. The parties agreed, however, to litigate the complaints at four locations where *Gissel* bargaining orders were sought — Bridgeton, Missouri; Norfolk, Virginia; Louisville, Kentucky; and Lawrenceville, Georgia. Ultimately, the Board found widespread unfair labor practices at these four locations, as well as nationwide unfair labor practices stemming from Overnite's pay increases in March 1995 and January 1996. The Board further found that, at these four locations, the ability to hold new elections that were fair "would be unlikely" and that the employees' wishes at these locations were "better gauged by . . . old card majorit[ies] than by . . . new election[s]." The Board therefore chose not to order new elections, opting instead to enter *Gissel* orders directing Overnite to bargain with the Teamsters.

On Overnite's petition for review and the Board's cross-application for enforcement, we conclude that most of the Board's findings of unfair labor practices were supported by substantial evidence, but some were not. We also conclude that the Board's decision to issue *Gissel* orders was not supported by evidence sufficient to justify that extraordinary relief. By declining to follow our long-standing precedents for the application of *Gissell*, the Board improperly bypassed the employees' will on the question of representation, frustrating the fundamental policy of employee democracy established by Congress in the labor laws. Accordingly, we grant in part and deny in part Overnite's petition for review; we deny the Board's cross-application for enforcement insofar as its order is inconsistent with this opinion; and we remand this case for new elections at the four service centers.

I

Before the Teamsters' organizing effort that commenced in late 1994, Overnite was a nonunion trucking company. Over the years, since at least 1980, it had followed the practice of granting its employees annual pay raises which took the form of either direct increases in hourly wages or increases in base mileage rates. The raises varied in character and in amount, depending upon Overnite's financial performance during the relevant period.

Until  1991, a raise was granted every October. In 1991, however,
poor performance forced Overnite to defer the raise until January

4

1992. Even then, only a small wage increase was granted. Again in 1992, Overnite deferred the annual raise to January 1993. By the end of 1993, continuing financial weakness forced Overnite to alter the form of its raise altogether. In addition to continuing its trend of deferring raises until January, Overnite changed the form of its raise in 1994 to a Performance Incentive Plan. Under the Plan, employees were to earn additional compensation after specified quarterly earnings targets were reached. In practice, however, the company met the targets only once, leading to only one Performance Incentive Plan payment. It was, perhaps, in response to Overnite's vulnerability from employee dissatisfaction with the Performance Incentive Plan that, in September 1994, the Teamsters began a campaign to organize Overnite's employees.

Overnite president Thomas Boswell responded to the organizing effort with a letter to employees, dated November 22, 1994, in which he criticized the Teamsters, warning that the union did not have the employees' interests in mind. He stated that the Teamsters cared only about obtaining income through union dues and the employees' pension fund, and he suggested that the union often caused strikes, harming both the employer and the employees. Boswell asserted that unionized companies "have often lost the battle to survive," pointing out that, over the last 30 years, the 50 top trucking companies had dwindled to 8 and that almost all had dealt with employees through the Teamsters.

In addition to criticizing the Teamsters, Boswell acknowledged, in December 1994, that the Performance Incentive Plan had been a failure. To cure this failure, he announced yet another version of the annual raise. Hourly employees would receive a 50-cents per hour raise in January 1995, along with other "improvements," such as compensation for time lost during breakdowns or weather delays. Nevertheless, by the end of 1994, two service centers — at Kansas City, Kansas, and Indianapolis, Indiana — had elected union representation and were certified.

Overnite responded to the 1994 employee dissension by making

Jim Douglas its new president in January 1995. As promised in Bos-
well's December announcement, Overnite awarded the 50-cent wage
increase that month. Nevertheless, the Teamsters' momentum contin-

5

ued as, during February, the union was elected and certified as the employees' bargaining representative at two more service centers — at Blaine, Minnesota, and Sacramento, California — bringing the Teamsters' representation to a total of four sites. By then, elections were also scheduled at 22 other service centers for February and March, and application petitions had been filed at 5 more.[1]

Possibly in response to the union's successes, Douglas sent employees a letter in February 1995 announcing a second 1995 wage increase of 55 cents per hour, plus an increase in the mileage rate and a $250 safety bonus, all of which were to take effect in March. In the letter, Douglas acknowledged that Overnite's pay had fallen behind that of some competitors. Although the letter was sent to all employees, including those represented by the union at the four certified service centers, Overnite stated that it was "prohibited from unilaterally implementing this discretionary increase for [represented] employees." Overnite also trumpeted this March 1995 wage increase in a new newsletter, *The Overniter*, announcing in large, bold type, "hourly wage increases across the board." The newsletter stated in smaller bold type that "Kansas City, Indianapolis, West Sacramento and Blaine employees who voted for Teamsters [were] not eligible."

In addition to the March 1995 wage increase, Douglas undertook a more concerted campaign against the Teamsters on two fronts. First, he sought to motivate Overnite's management to engage in the fight against the Teamsters, making numerous statements in letters and speeches to the effect that the Teamsters were a threat to the company

_____

[1] Elections were scheduled at Bensalem, Pennsylvania (2/2/95); Cornwell Heights, Pennsylvania (2/14/95); Bridgeton, Missouri (2/28/95); Milwaukee, Wisconsin (3/6/95); Appleton, Wisconsin (3/6/95); Grand Rapids, Michigan (3/7/95); Detroit, Michigan (3/15/95); Lexington, Kentucky (3/15/95); London, Kentucky (3/16/95); South Bend, Indiana (3/16/95); Louisville, Kentucky (3/17/95); Charleston, West Virginia (3/20/95); Parkersburg, West Virginia (3/21/95); Pennsauken, New Jersey (3/23/95); Toledo, Ohio (3/24/95); Elmsford, New York

(3/24/95); Cincinnati, Ohio (3/28/95); Rockford, Illinois (3/28/95); Nashville, Tennessee (3/29/95); Dayton, Ohio (3/30/95); Parsippany, New Jersey (3/31/95); and Norfolk, Virginia (3/31/95). Also, election petitions had been filed in Lafayette, Indiana; Fort Wayne, Indiana; Bowling Green, Kentucky; Moonachie, New Jersey; and Bayshore, New York.

6

and that working conditions would be better if Overnite remained union-free. In a letter sent to Overnite's service center managers, he stated that the union's campaign was "the biggest war of our lives" and that, to win, management had to "sound the bugle call and unleash the fury of the Overnite machine." He urged Overnite to "muster [its] troops to all out attack."

The second front targeted Overnite's employees directly. Through Douglas's leadership, Overnite started a campaign called "Give Jim a Chance," distributed T-shirts and buttons, and promised greater responsiveness to employee concerns. Douglas personally visited many service centers to inquire about employee concerns, asserting that his approach would be much different from that of former-president Boswell and that he would take care of the employees. Douglas also sent out a "quality team" of "troubleshooters" to Over-nite's service centers, whose mission was to discover the causes of employee unrest and to assess who favored the Teamsters and who did not. Acting as company ombudsmen, the troubleshooters prom-ised to take employee grievances back to Overnite's headquarters and to resolve them.

While assuring employees that it could meet their needs, Overnite was candid about its opinion of unions. Overnite's employee hand-book stressed "that this Company values union-free working condi-tions." Overnite also widely publicized the 13-year bargaining stalemate at its Chicago service center, where the Teamsters repre-sented the employees. Even though a union had been certified in Chi-cago as early as 1982, Overnite pointed out that bargaining there had attained few favorable results for the employees. The union had con-ducted a strike there but still had no contract with Overnite.

In addition to its nationwide efforts, Overnite countered the union organizing effort with its own carrot-and-stick campaign at individual service centers, including the four at issue in this case — Bridgeton, Norfolk, Louisville, and Lawrenceville. The Board found many of Overnite's actions in furtherance of its campaign to be unfair labor practices.

In Bridgeton, pro-union literature was removed from the break
room, the bulletin board, and the employee bathroom, while anti-

7

union literature was left alone. Supervisors followed pro-union employees and interfered with their conversations with other employees. To complement the anti-union sentiment, Overnite sent "trouble-shooters" to ride with the drivers, soliciting grievances from them. The service center manager also told the employees that Overnite was looking into overtime and, while he could not make promises, he was "pretty sure" it would happen; it was "almost a done deal." Douglas visited Bridgeton several times to discuss overtime pay with the employees. He told the employees that the company would take care of its own and that it did not need third party interference. The election was held on February 28, 1995, and the union lost by a vote of 24 to 22.

In Norfolk, where employees had been permitted to post anything on bulletin boards, pro-union literature was destroyed and an employee who posted such literature was told by a manager that "people could get fired for this." Supervisors broke up conversations, and a manager warned employees that their relationships with their supervisors would change for the worse if the union were elected. Two pro-union employees were called "agitators" by their manager, and the manager added that he did not want anything bad to happen to them and that they should be careful. He implied that, if the union lost the election, they could be fired for their pro-union stance. The head service center manager made predictions about the consequences of unionization. He noted that union employees at Kansas City had not received the March 1995 wage increase, and he warned that the Norfolk bargaining experience would result in a stalemate like the one in Chicago. Another supervisor indicated that the then-pending March wage increase would be lost if the union was elected. The election was held on March 31, 1995, and the union lost by a vote of 58 to 29.

In Louisville, Overnite's central management urged employees to give Jim Douglas a chance. An Overnite Vice President visited Louisville in November 1994 and asked employees if there were complaints with which he could help them. When told that the employees

wanted overtime pay, he said that, while he could not promise to pay
time-and-a-half, "possibly, in the future, things might get better." In
March 1995, about a week before the election, Douglas visited Louis-
ville, again promising improvements. He used the March 1995 wage

8

increase as an example of his positive changes. On the negative side of the carrot-and-stick campaign, Douglas warned employees that the Teamsters would likely try to block the March 1995 pay raise. Other Overnite management warned that, if elected, the Teamsters would ruin Overnite. Dispatchers told two employees that, if Overnite went union, it would close its doors, leaving all the employees out of work. An Overnite vice president told the employees that company representatives simply showed up for negotiations in Chicago, explaining that even if charges were filed for bargaining in bad faith, the company would be required only to pay a small fine. It would then not have to return to the negotiating table until the following year. He suggested that the only way to get a union contract would be to go on strike, and employees who took that course could be replaced. The "Wheel of Misfortune," a circular passed out during a discussion of strikes, showed employees what they could lose by going on strike. A supervisor warned that, if the union was elected, he would enforce company rules more stringently, writing employees up for every arguable violation. A supervisor also warned that Overnite would "play hardball" if the union won the election. As election day approached, supervisors removed pro-union materials from the break room, leaving anti-union materials. One supervisor told an employee that the union pin he was wearing could be hazardous to his health. Another supervisor told an employee that, since the union campaign had started, he had an "attitude problem." A supervisor prohibited union adherents from talking with other employees. The Louisville election was held on March 17, 1995, and the union lost by a vote of 85 to 83.

In Lawrenceville, employees were also prevented from posting pro-union materials on employee bulletin boards in the break room. At mandatory meetings, employees were told that Overnite would go out of business if the Teamsters were elected, and employees who supported the union were advised to seek employment at a union company. Managers and an Overnite vice president reminded the employees of the troubled Chicago bargaining experience, warning

that, even if the union won the election, Overnite would take an adversarial bargaining position with every incentive to meet only the bare requirements of good-faith bargaining. One dispatcher cautioned that the company would never sign a union contract. A manager warned that he would revert to previously ignored infractions if he

9

needed to get rid of people. Again, the warnings were supplemented with the message that existing management would adequately meet the employees' needs. The service center manager encouraged employees to give Jim Douglas a chance. He suggested that improvements in the company were imminent, but that they would be available only if employees voted against the union. On separate occasions, a dispatcher and a vice president noted that the Kansas City service center, which had voted for the Teamsters, did not get the March 1995 pay raise and that the raise would have to be negotiated with the union. Shortly before the scheduled election, Douglas visited Lawrenceville and asked one employee whether he was willing to sacrifice 14,000 jobs for "this campaign." The election was held on April 17, 1995, and the union lost by a vote of 42 to 38.

Based on these incidents, the Teamsters filed numerous unfair labor practice complaints, and at 17 service centers where it lost elections, it sought orders from the NLRB directing Overnite to bargain with the Union without having new elections. The Board's General Counsel issued a consolidated complaint alleging that Overnite violated § 8(a)(1) and (3) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 158(a)(1) and (3). As characterized by the administrative law judge ("ALJ") and by the Board, the proceedings were "massive," involving numerous allegations of unfair labor practices at distinct locations as well as alleged nationwide unfair labor practice in implementing the March 1995 wage increase.

In July 1995, the General Counsel and Overnite settled almost all of the § 8(a)(1) unfair labor practice complaints and those § 8(a)(3) unfair labor practice complaints for which the only remedy required was a cease-and-desist order and the posting of notice. They also settled certain § 8(a)(3) complaints relating to the national wage package at specified locations where the Teamsters had already been certified as representing the employees. The settlement left for resolution the so-called "national" allegations and other allegations that, in the General Counsel's view, supported *Gissel* bargaining orders. In considering the *Gissel* orders, the General Counsel specifically reserved the right to use evidence pertaining to allegations that had

previously
been settled. Thus, following the July 1995 settlement, the parties
agreed to litigate the *Gissel* complaints with respect to the four ser-
vice centers at Bridgeton, Norfolk, Louisville, and Lawrenceville.

10

By the end of 1995, the Teamsters represented the employees at eight of Overnite's service centers, and the union had been elected to represent the employees at six other centers where it was awaiting certification. The Teamsters locals had also entered into coordinated bargaining with Overnite through a Teamsters national committee founded for that purpose.

Meanwhile, during 1995, Overnite continued its annual practice of assessing its financial performance for the purpose of setting the terms of its annual wage increase. Because another year of financial losses made a wage increase appear impossible, Overnite retained a consultant to study its operations and to recommend productivity improvements. The consultant proposed numerous changes which it predicted would result in annual savings to Overnite of approximately $65 million. To make possible a wage increase for 1996 of between 40 cents and 60 cents per hour, Overnite decided to link the raise to the consultant's recommended productivity changes.

On December 7, 1995, Overnite conducted satellite conferences with all of its service center managers and provided them with an extensive guide to use in presenting the productivity changes to employees. Overnite then notified its unrepresented employees of the changes on December 11, 1995, presenting the changes through a videotape of Douglas and supporting documents. On that day, the information was also sent, via overnight mail, to the union representatives of Overnite's certified service centers and to the representatives of service centers still awaiting certification. Overnite offered the Teamsters the same package that was granted to nonunion employees. On December 13, several days before the negotiations with union representatives were scheduled to begin, Overnite held a meeting where it explained the proposed terms of the 1996 wage increase to represented employees and to employees at the service centers awaiting certification.

Overnite's plan was to link the 1996 wage increase to performance, as it had done in previous years. Thus, in exchange for a wage increase, Overnite sought to implement productivity improvements by retaining the right, among other things, to set work days,

hours, and
routes; to assign work and equipment; to separate employees involun-
tarily; to contract for casual or temporary personnel; and to divert

11

freight to alternative modes and carriers. The Teamsters, however, took the position that the "wage increase [was] an established past practice of Overnite, and that, as [Overnite was] obligated to maintain the status quo pending a collective-bargaining agreement, the wage increase must be extended to [represented employees]." Because the Teamsters refused to negotiate the productivity changes, except as part of an overall contract, Overnite eventually declared an impasse in negotiations. It announced its intention to implement the productivity agreement unilaterally at the six units awaiting certification, effective August 4, 1996.

The union filed another unfair labor practice complaint, alleging that, by explaining the productivity changes to the employees in the represented centers without first adequately negotiating with the Teamsters, Overnite bypassed the union and engaged in direct dealing. The union also alleged that Overnite unilaterally changed the represented employees' terms of employment by failing to give them the wage and benefit improvements and by implementing the terms of the productivity changes at the six units where the Teamsters had been elected but not yet recognized. This complaint was added to the consolidated proceedings that were in progress.

The Board, substantially affirming the ALJ's lengthy findings, concluded that Overnite "had committed unfair labor practices affecting employees on a nationwide basis and that the issuance of *Gissel* bargaining orders was warranted." *Overnite Transp. Co.*, 329 N.L.R.B. 1 (Nov. 10, 1999). Finding that the conduct fell within a Category II type of order, as identified by the Supreme Court's opinion in *Gissel*, the Board explained:

> [Overnite's] course of misconduct both before and after the elections, clearly demonstrates that the holding of fair elections in the future would be unlikely and that the "employees' wishes are better gauged by [ ] old card majorit[ies] than by . . . new election[s]."

*Id.* at 2 (quoting *Charlotte Amphitheater Corp. v. NLRB*, 82 F.3d 1074, 1078 (D.C. Cir. 1996) (modifications in the original)). The

Board relied not only upon evidence relating to unfair
labor practices

12

alleged to have occurred before the July 1995 settlement, but also upon the January 1996 wage increase.

The Board pointed to the January 1996 wage increase to reject Overnite's argument that a *Gissel* order was unnecessary because it had corrected its practices after the July 1995 settlement. *Id.* at 3. In response to Overnite's two other arguments for why a *Gissel* order was inappropriate — that significant time had elapsed and that substantial employee turnover had occurred — the Board stated that the facts of time passage and employee turnover were irrelevant. Rejecting the employee-turnover argument, the Board stated:

> The Board traditionally does not consider turnover among bargaining unit employees in determining whether a bargaining order is appropriate, but rather assesses the situation at the time the unfair labor practices were committed.

> * * *

> In the present case, even accepting, arguendo, the facts asserted by [Overnite] concerning employee turnover, we find the effects of [Overnite's] unlawful conduct are not likely to be sufficiently dissipated by turnover to ensure a free second election.

> * * *

> As the Fifth Circuit has recognized, "Practices may live on in the lore of the shop and continue to repress employee sentiment long after most, or even all, original participants have departed."

*Id.* at 5 (quoting *Bandag, Inc. v. NLRB*, 583 F.2d 765, 772 (5th Cir. 1978)). Accordingly, the Board ordered Overnite to cease and desist from implementing the January 1996 wage increase and directing it to bargain with the Teamsters at the four locations at issue.

On appeal, a divided panel of this court affirmed the Board, granting its cross-application for enforcement and denying Overnite's peti-

13

tion for review. *Overnite Transp. Co. v. NLRB*, 240 F.3d 325 (4th Cir. 2001). The panel held that the Board's findings of unfair labor practices were supported by substantial evidence and that the Board acted properly in bypassing new elections in favor of *Gissel* bargaining orders. Pursuant to a request for a poll, the court voted to rehear this case en banc and, in ordering a rehearing en banc, vacated the panel decision.

II

In support of its conclusion that Overnite committed unfair labor practices, the Board found (1) that the March 1995 wage increase was coercive and discriminatory, in violation of § 8(a)(1) and (3) of the Act; (2) that other unfair labor practices, although settled in July 1995, nonetheless provided evidence of illegal conduct at the four sites in question to support *Gissel* orders; and (3) that the January 1996 wage increase was coercive and discriminatory, in violation of §§ 8(a)(1) and 8(a)(3) and involved direct negotiations with repre- sented employees, in violation of §§ 8(a)(1) and 8(a)(5) of the Act. The Board also found that certain attorney questioning of Overnite employees at the Louisville service center was coercive, in violation of § 8(a)(1) of the Act. Overnite challenges these findings, contending that they are not supported by substantial evidence.

It is now well settled that Board findings of fact are conclusive as long as they are "supported by substantial evidence on the record con- sidered as a whole." 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 490-91 (1951). While "[t]he Board may not base its inference on pure speculation . . . it may draw reasonable inferences from the evidence." *Owens-Corning Fiberglas Corp. v. NLRB*, 407 F.2d 1357, 1362 (4th Cir. 1969). Even though we might reach a different result after hearing the evidence in the first instance, we defer to the Board's findings of fact that are supported by substan- tial evidence. *NLRB v. Daniel Constr. Co.*, 731 F.2d 191, 193 (4th Cir. 1984).

Under this standard, we conclude that substantial evidence supports the Board's findings with respect to the March 1995 wage increase and the localized unfair labor practices at the four

locations consid-
ered in this case. We further conclude, however, that the
Board's

14

unfair labor practice findings with respect to either the January 1996 wage increase or the attorney questioning of Overnite's employees at Louisville are not supported by substantial evidence. We address these conclusions *seriatim*.

## A

Both the timing and the context surrounding the March 1995 wage increase support the Board's inference that the increase was intended to influence upcoming union elections and to discriminate against those favoring the union. With regard to timing, a red flag is raised by the fact that this wage increase was in addition to the normal wage increase that the company had implemented over the years in either October or January. Overnite had already granted its usual wage increase in January 1995, and it announced the March 1995 increase as a supplement.

In addition, the 1995 wage increase was granted at a time that was close to elections at several service centers. Elections were scheduled in late February (soon after the announcement of the March 1995 wage increase) at three service centers. They were scheduled in March (when the raises would begin to appear on paychecks) at 19 service centers. Also, at the time of the announcement, election petitions had been filed at five other service centers. The timing of a wage increase alone might have been sufficient to support the Board's finding of an unfair labor practice. *See NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409 (1964) (noting the "danger inherent in well-timed increases in benefits"); *J.P. Stevens & Co. v. NLRB*, 461 F.2d 490, 492 (4th Cir. 1972) (inquiring whether substantial evidence supported a finding that a benefit announcement was timed to "give[] [employ-ees] cause to infer that the benefit might be withdrawn or future benefits withheld should they select a union to represent them").

In addition to the timing of the March 1995 wage increase, the context in which it was granted supports the Board's inference of an intent to influence elections. The Board set forth a laundry list of circumstances from which the employees could infer that "the source of benefits . . . conferred is also the source from which future

benefits
must flow and which may dry up if it is not obliged." *Overnite Transp.*, 329 N.L.R.B. at 3 (quoting *Exchange Parts*, 375 U.S. at

15

409). The wage increase was announced prominently in *The Over-niter* with a bold-type message that union employees were not eligible for the increase. Overnite also advised employees that it would not be able to grant the wage increase to represented employees. Moreover, the March 1995 wage increase was given in conjunction with the "Give Jim a Chance" campaign and Douglas's visits to service centers to solicit employee grievances. It followed letters from Douglas to employees, asserting that the union was a threat to Overnite and refer-encing the Chicago bargaining experience. These efforts were made against the backdrop of Overnite's employee handbook which stated "that this Company values union-free working conditions." Thus, in addition to timing, we conclude that the context of the March 1995 wage increase supports the Board's finding. *See Owens-Corning*, 407 F.2d at 1362 (noting that, while timing is a factor, "the thrust of *Exchange Parts* is the condemnation of granting such benefits with the purpose of affecting the outcome of an election").

Overnite attempted to respond to the General Counsel's evidence with evidence that it was pursuing "a proper business purpose." *See J.P. Stevens & Co.*, 461 F.2d at 493. We conclude, however, that in the context of a national campaign accompanied by numerous com-pany actions — some legal and some not — it remained within the Board's prerogative to make the factual findings that it made, and substantial evidence in the record supports those findings. "[I]t is not our province, where substantial evidence supports the conclusion of the Board, to substitute our own judgment for that of the Board." *Owens-Corning*, 407 F.2d at 1360-61.

B

There is also substantial evidence in the record to support the Board's finding of § 8(a)(1) violations at Overnite's service centers in Bridgeton, Norfolk, Louisville, and Lawrenceville. At these locations, Overnite led a "carrot and stick" campaign, promising improvements while warning that hard times were sure to follow if the Teamsters were elected.

At all four centers, Overnite solicited grievances from employees

and implied that changes were imminent. As with the March 1995
wage increase, the circumstances surrounding this sudden generosity

16

suggested a "fist inside the velvet glove." *Exchange Parts*, 375 U.S. at 409. Management at all four service centers prohibited the posting of pro-union fliers in the break rooms. Bridgeton supervisors took further measures to interfere with pro-union employees' ability to communicate with other employees. Moreover, by reminding employees of the Chicago experience and threatening to play hardball when negotiating with any union, Overnite implied that collective bargaining would be futile. In addition to these violations at all four service centers, the supervisors at Louisville and Lawrenceville warned that Overnite could go out of business if the union were elected. While the supervisors never threatened plant closure, it was not erroneous for the Board to conclude that the warnings were intended to influence the upcoming election.

In addition to carrying out the carrot-and-stick campaigns, the supervisors at Lawrenceville, Louisville, and Norfolk were candid in expressing disdain for pro-union employees. In Louisville, a pro-union employee was told that he had "an attitude problem." In Norfolk, pro-union employees were referred to as "agitators" and were warned to be careful of retaliation if the union lost. While these comments may not have been explicit threats of retaliation, they provide support for the Board's conclusion that Overnite intended to influence the outcome of the elections.

C

Unlike the findings about the March 1995 wage increase and the localized conduct, the findings that the January 1996 wage increase constituted an unfair labor practice are not supported by substantial evidence. The 1996 wage increase was granted at a different time and in a different context than the 1995 wage increase. Whereas the 1995 wage increase was granted in the face of over 20 pending elections, the 1996 wage increase was made when few elections were pending and after a major settlement had occurred. Moreover, while the 1995 wage increase was granted in March as the second wage increase of the year, the 1996 wage increase was granted in January, at what had become the "usual time" for Overnite's annual wage increase.

Moreover, the 1996 wage increase was not featured in *The Over-niter* with warnings that it would be unavailable to union employees,

17

and it was not coupled with warnings that bargaining would be futile. To the contrary, Overnite offered the represented employees exactly what it granted the unrepresented employees. As had been Overnite's practice, the offer for a wage increase included conditions; there were performance requirements that made it possible for Overnite to justify the wage increase even though it had suffered losses the previous year. The Teamsters simply rejected the offer because it thought that the union was entitled to a better deal.

Thus, neither the timing nor the context of the 1996 wage increase supports the conclusion that the offer was coercive and therefore in violation of § 8(a)(1) of the Act.

The record similarly does not support the Board's conclusion that, in offering the 1996 wage increase, Overnite discriminated against the union, in violation of § 8(a)(3). While § 8(a)(3) makes it unlawful to discourage union membership by discrimination "in regard to . . . any term or condition of employment," 29 U.S.C. § 158(a)(3), there is no duty to grant to union employees every benefit that is granted to non-union employees. *Phelps Dodge Mining Co. v. NLRB*, 22 F.3d 1493, 1500 (10th Cir. 1994); *Chevron Oil Co. v. NLRB*, 442 F.2d 1067, 1074 (5th Cir. 1971). Indeed, because the employer is prohibited from granting unilateral wage increases to represented employees, *see* 29 U.S.C. § 158(a)(5), when the employer unilaterally grants a wage increase to nonunion employees, it *must* treat union employees differ-ently. Before granting the wage increase to union employees, an agreement must be reached with union representatives.

As wage increases cannot be granted to union employees until there is negotiation, the key issue in determining whether there was discrimination is whether the union employees were foreclosed from the opportunity to receive the wage increase through negotiation. *Accord Kezi, Inc.*, 300 N.L.R.B. 594, 601 (1990).

Because the record clearly shows that the union employees were not foreclosed from receiving the 1996 wage increase, a § 8(a)(3) vio-lation cannot be established. Overnite offered the Teamsters the same package that it granted to nonunion employees, and the union was given the opportunity to accept it. The Teamsters simply

rejected the
offer, asserting that union employees were entitled to the
wage

increase as an established past practice and that only the productivity responsibilities accompanying the wage increase were subject to negotiation. In essence, the union asserted that, unlike the nonunion employees, represented employees were entitled to the increase without the productivity responsibilities. The fact that Overnite refused to accept this counteroffer cannot form the basis for a § 8(a)(3) violation.

The Board has tried to avoid the necessary disparate treatment of nonunion and union employees by adopting the Teamsters' position that the wage increase was not, in fact, a change over prior years. By characterizing the wage increase as part of the established compensation system, the Board avoided the problem that its position would have required Overnite unilaterally to grant a wage increase. Instead, the Board asserted that Overnite unilaterally *took away* the wage increase. But this assertion is inconsistent with the nature of Overnite's practices with regard to wage increases.

The standard for whether a practice has become part of the established wage or compensation system is whether it would be clearly apparent to an objectively reasonable employer that the "grant or denial of a benefit, at the time the action is taken, conforms to the status quo." *Southern Maryland Hosp. Ctr. v. NLRB*, 801 F.2d 666, 669 (4th Cir. 1986) (requiring a finding that Christmas bonuses were given over a significant period of time before they could be treated as status quo). Compensation practices such as bonuses are not considered a "term[ ] and condition[ ] of employment" unless "they are of such a fixed nature and have been paid over a sufficient length of time to have become a reasonable expectation." *Phelps Dodge Mining*, 22 F.3d at 1496 (citations and internal quotation marks omitted).

While there is substantial evidence in this case to support the conclusion that annual wage increases were paid over a significant length of time, the *nature* of the wage increases was not sufficiently fixed to become a "term or condition of employment." Where wage increases are tied to unpredictable and discretionary factors, such as profitability, and the amounts do not follow a discernable pattern,

they are not of "a fixed nature." *Phelps Dodge Mining*, 22 F.3d at
1496. For example, it has been held that eight payments to various
employees over four years, where the payments were of varying

19

amounts at varying time intervals, and where there were complaints about their unpredictability, did not amount to substantial evidence that the payments were fixed. *Id.* at 1497.

To the extent that a wage increase was expected, Overnite's practice followed a pattern that the nature of the wage increase was dictated by profitability, the only constant being that each year's wage increase was different. For example, Overnite's profitability was so low in 1991 that no wage increase could be granted that year. And beginning in 1992, because of profitability concerns, the wage increase was granted in January instead of October. In addition, profitability affected Overnite's packaging of the wage increase. For example, the 1994 wage increase was granted as part of the Performance Incentive Plan. The 1996 wage increase simply repeated this model. Because of profitability concerns, Overnite proposed to include performance obligations with the wage increase. While this *quid pro quo* was initiated unilaterally with regard to nonunion employees, Overnite followed its § 8(a)(5) duty to bargain collectively with the Teamsters before initiating the proposal with respect to employees represented by the Teamsters.

If the Teamsters had accepted that offer, union employees would have received the same wage increase that nonunion employees received. The Teamsters, however, rejected the offer, requesting instead the wage increase without the attendant performance obligations. By separating the wage increase from facilitating conditions, the Teamsters created an illusion, which the Board accepted, that something was being taken away. To agree with this conclusion, however, would require us to hold that, simply by organizing, union employees became entitled to a better deal than nonunion employees. Because such a holding would unconscionably mischaracterize the nature of profitability-related wage increases, we cannot conclude that Overnite's practices violated § 8(a)(3) of the Act.

Finally, the record lacks substantial evidence to support a § 8(a)(5) violation. Section 8(a)(5) prohibits an employer from bypassing the union to bargain directly with employees. 29 U.S.C. § 158(a)(5);

*Medo Photo Supply Corp. v. NLRB*, 321 U.S. 678, 684 (1944); *Holly Farms Corp. v. NLRB*, 48 F.3d 1360, 1368 (4th Cir. 1995). However, an employer is allowed to talk with employees and to communicate

20

its position to them. *Americare Pine Lodge Nursing & Rehab Ctr. v. NLRB*, 164 F.3d 867 (4th Cir. 1999). The limit of these communications is offering a *quid pro quo* that is not before the union. *Id.*

The employer's § 8(a)(5) duty is to present proposals to the union before communicating them to employees. *See Americare*, 164 F.3d at 876-77 (holding that an employer could only distribute its proposal to union employees when the proposal was "properly before" the union). There is, however, no "rule requiring employers to delay informing [their] employees of a proposal until the union has some period of time to consider it. Communications to employees that inform them of their employer's bargaining position constitute no violation." *Id.* (citation omitted). Publicizing the offer that is before the union does not erode the union's position as the bargaining representative because as long as the presentation is not coercive, such publication is a reasonable dissemination of information "that aids employees in making informed decisions and promotes a stable bargaining environment." *Id.*

In this case, Overnite informed the Teamsters of its proposed productivity plan before informing the representative employees of the plan. The plan was sent to union representatives on December 11, 1995, by overnight mail. When Overnite presented the plan to its representative employees on December 13, it was merely exercising its right to publicize its bargaining position. The record does not suggest that the proposal was coercive in any way. To the contrary, represented employees were told that Overnite was negotiating over the increase with the union and that they should refer feedback and questions to their union representatives. Those negotiations were scheduled to begin around December 17, 1995.

Because we conclude that substantial evidence does not support a finding that the 1996 wage increase amounted to an unfair labor practice, we refuse to enforce the Board's order insofar as it redresses that wage increase.

D

Finally, Overnite challenges the Board's finding that certain ques-

tions asked by Overnite's attorneys to employees at Overnite's Louis-
ville service center violated § 8(a)(1) of the Act.

21

In preparation for the hearing before the ALJ, Overnite's attorneys distributed an eight-page questionnaire to Overnite's employees at the Louisville service center. The ALJ concluded that the following four questions were coercive, in violation of § 8(a)(1):

> (1) If you didn't sign the card or petition the first time you were asked, why did you sign it when you were asked to do so again?

> (2) Who did you give the card or petition to after you signed it?

> (3) Did anyone from the Union tell you it was important for you to report to the Union or any employee any problems you had with the Company since the Union needed unfair labor practice charges to help them over-turn the election? If yes, who?

> (4) Have you given a statement to anyone else regarding the election or the Company's or the Union's conduct?

On review, the Board found that the first and third questions were unlawfully coercive and declined to pass on the other two.

In considering whether posing such questions to employees was coercive, we note that employers may ask their employees about their sentiments regarding the union. But the questions may become coer-cive if they have "a reasonable tendency in the totality of the circum-stances to intimidate." *Standard-Coosa-Thatcher Carpet Yarn Div., Inc. v. NLRB*, 691 F.2d 1133, 1137 (4th Cir. 1982) (internal quotation marks and citations omitted). "The gravamen of the violation is intim-idation tending to discourage union activities." *NLRB v. P.B. & S. Chem. Company*, 567 F.2d 1263, 1267 (4th Cir. 1977).

To determine whether employers' questions put to employees are coercive, we consider whether the employer followed specific safe-guards. First, "the employer must communicate to the employee the purpose of the questioning, assure him that no reprisal will take place, and obtain his participation on a voluntary basis; [second,] the ques-

22

tioning must occur in a context free from employer hostility to union organization and must not be itself coercive in nature; and [third,] the questions must not exceed the necessities of the legitimate purpose by prying into other union matters, eliciting information concerning an employee's subjective state of mind, or otherwise interfering with the statutory rights of employees." *Standard-Coosa-Thatcher*, 691 F.2d at 1140 n.8 (quoting *Jonnie's Poultry Co.*, 146 N.L.R.B. 770, 775 (1964)).

With respect to the first question at issue, the ALJ found that the employer was improperly inquiring into the employee's subjective reasoning. While this inference is possible, it is likely that the question actually sought information about the union's activities, and not merely the employee's subjective state of mind. Because of this ambiguity, the ALJ should have considered the other safeguards before reaching its conclusion that the question was coercive.

With respect to the second, third, and fourth questions, the ALJ found that they exceeded Overnite's legitimate purposes. We do not agree. Overnite had the right to determine the context of union recruitment, and its questions were geared toward determining what organizers did to encourage employees to sign cards. Even if we agree that the questions might be construed as overly broad, the ambiguity precluded the ALJ from reaching the conclusion that the questions were in fact coercive without considering the other safeguards.

Accordingly, with respect to the Board's findings on the questions posed by Overnite's attorneys, we remand for further consideration by the Board should the Board find it necessary and appropriate to consider them in the light of our other rulings.

### III

This brings us to the principal argument raised by Overnite in its petition for review — whether the Board abused its discretion in bypassing the traditional remedy of ordering new elections by ordering Overnite to bargain with the Teamsters at the four locations at Bridgeton, Norfolk, Louisville, and Lawrenceville. The Board concluded that fair elections could not be conducted because

the unfair
l abor practices were so severe and were carried out by such
high-

23

ranking officers of Overnite that its employees would remember the practices.

Overnite advances four reasons why the Board's conclusion is unsupportable. First, it points out that it settled most of the unfair labor practices in July 1995 and took "extraordinary steps to avoid future unfair labor practices." Second, it notes that turnover at the four sites was extensive, ranging, as of early 1999, from 29% to 40% of the employees. Third, it points out that Overnite's management, which was involved in the unfair labor practices, had all left their positions. And fourth, it asserts that the four-to-five-year lapse of time since the unfair labor practices occurred dissipated their harmful effect. In sum, Overnite argues that changes in circumstances following the unfair labor practices left little reason to conclude that fair and accurate reelections could not take place.

In response, the Board pointed to the 1996 wage increase as evidence of continuing unfair labor practices by Overnite following the July 1995 settlement. As we have now found the Board's position on that issue unsupported, it cannot support the bargaining orders. The Board also posited that employee turnover is not a fact that is considered under Board precedent. But even when turnover is considered, the Board concluded that the lore of the shop carries on the adverse effect of past unfair labor practices. Finally, the Board declared that it generally does not consider the passage of time to be relevant. Rather, it considers unfair labor practices and the remedies for them at the time they were committed — in this case in late 1994 and early 1995. In any event, the Board concluded summarily that the passage of four to five years after the unfair labor practices was not sufficiently long to conclude that *Gissel* orders were unwarranted.

The background facts of the changed circumstances in this case are not disputed. At the four relevant service centers, the union obtained signed card majorities before the elections from 27 employees at Bridgeton (from a unit of 49); 62 at Norfolk (from a unit of 91); 117 at Louisville (from a unit of 174); and 45 at Lawrenceville (from a unit of 86). At each location the union lost the election,

mostly by a
small margin.

Following the elections at these and other sites, the Teamsters complained of unfair labor practices, and the General Counsel filed more than 20 complaints. Most of the complaints were settled on July 29, 1995. And except for the 1996 wage increase, which we have overturned as an unfair labor practice, there was virtually no evidence of unfair labor practices committed after the settlement.[2] The settlement did leave open for adjudication the Teamsters' request for *Gissel* orders at Bridgeton, Norfolk, Louisville, and Lawrenceville, and with respect to these four locations, the ALJ issued his findings of fact and recommendations for the issuance of *Gissel* orders on April 10, 1998, and the Board issued the *Gissel* orders on November 10, 1999.

In the interim, employee turnover was concededly significant. As of early 1999, there had been a 40% employee turnover at Bridgeton; 32% at Norfolk; 29% at Louisville; and 36% at Lawrenceville. In addition, virtually all of the Overnite management involved in the unfair labor practices had left or been replaced. Douglas, Overnite's president, left in February 1997; Edwards, one of the persons to whom threats about the Chicago experience were attributed, left in December 1995; and the managers of all four service centers had left at various times.

In the context of this evidence, we must determine whether fair reelections could have been conducted five years later under appropriate supervision by the Board, or, stated in the language of *Gissel*, whether the "coercive effects" of the unfair labor practices had been eliminated so that a "fair and reliable election" could be held. *Gissel*, 395 U.S. at 614.

The applicable *Gissel* principles have been repeatedly articulated in this circuit. First, we have noted that it is the strong preference of our national labor policy not to impose collective bargaining representatives on employees except when they have, by a majority vote, elected to be so represented. *See NLRB v. Apple Tree Chevrolet, Inc.*, 671 F.2d 838, 840 (4th Cir. 1982) ("*Apple Tree II*"). Because "an

---

[2] The Board also found that lawyers' questioning of employees in prep-

aration of Overnite's defense in Louisvil l e committed unfair l abor prac-
tices in posing coercive questions to the empl oyees. But we have
concl uded that these al l egations al so were unsupported by the record.

25

election, not a bargaining order, remains the traditional, as well as the preferred, method for determining the bargaining agent for employees," *NLRB v. Apple Tree Chevrolet, Inc.*, 608 F.2d 988, 996 (4th Cir. 1991) ("*Apple Tree I*"), "the extraordinary and drastic remedy of forced bargaining pursuant to [*Gissel*] is reserved for only the most unusual cases." *Be-Lo Stores v. NLRB*, 126 F.3d 268, 273 (4th Cir. 1997) (internal quotation marks and citations omitted). *Gissel* orders are available only when traditional remedies are insufficient to make possible a "fair and reliable election." *Gissel*, 395 U.S. at 614. Second, when imposing *Gissel* orders, we require "specific" and "detailed" findings. *Apple Tree II*, 671 F.2d at 840.

To satisfy the requirements for imposing a Category II type of *Gissel* order — the type involved in this case[3] — the Board must make detailed findings specifically supporting the facts that (1) the union enjoyed a preelection majority in the relevant unit; (2) the employer committed an unfair labor practice; (3) the unfair labor practice caused the union's majority status to be dissipated; (4) the possibility of conducting a *fair* reelection would be slight; and (5) the employees' preelection sentiments would be better protected by a bargaining order than by a new election. In turn, to find that the possibility of conducting a fair election would be slight and that employees' previolation sentiments would be better protected by a bargaining order, the Board must specifically consider and make findings about (a) the likelihood of recurring misconduct; (b) the residual impact of unfair labor practices, considering whether that effect has been or will be dissipated by the passage of time; and (c) the efficacy of ordinary remedies. *See generally Gissel*, 395 U.S. at 613-14; *Be-Lo*, 126 F.3d at 282; *Apple Tree I*, 608 F.2d at 696-97.

---

[3] The Supreme Court has recognized a Category I type of case that it characterized as an "exceptional" case, in which bargaining orders may be imposed without inquiry into a union's preelection majority status. This Category I case is "marked by `outrageous' and `pervasive' unfair labor practices," where the coercive nature of the illegal practices "cannot be eliminated by the application of traditional

remedies." *Gissel*, 395 U.S. at 613-14. The *presumptive* impossibility of having a "fair and reliable" election is the essence of this Category I type of case, which neither the Board nor the parties assert is the situation presented in this case.

26

In this case, the Board properly considered the union's preelection majority status, the employer's unfair labor practices, and the causal relationship between those practices and the dissipation of the union's majority. The Board failed, however, to direct us to evidence that a new fair election could not be conducted in the circumstances presented.

While the Board purported to address the prospects for a new election, it spoke only in a conclusory manner, without directing the court to any factually based reason why new elections could not be fair in this case. The Board stated in a conclusory fashion, "that the holding of fair elections in the future would be unlikely and that the employees' wishes are better gauged by old card majority than by new election." *Overnite Transp.*, 329 N.L.R.B. at 3 (internal quotations and alterations omitted). While the Board did examine the likelihood of reoccurrence of the unfair labor practices, its assessment rested almost entirely on its conclusion that the January 1996 wage increase violated § 8(a) of the Act. But we have already concluded that the January 1996 wage increase did not violate the Act. And there was no other indication that the unfair labor practices settled in July 1995 would reoccur.

Moreover, other factors, which would suggest that a fair election could be held, were improperly ignored by the Board as irrelevant. The Board indicated that it generally does not evaluate the passage of time between the unfair labor practices and the issuance of an order to be relevant. More importantly, the Board has stated that it does not consider employee turnover that might occur during any such passage of time:

> The Board traditionally does not consider turnover among bargaining unit employees in determining whether a bargaining order is appropriate, but rather assesses a situation at the time the unfair labor practices were committed.

If the unfair labor practices are severe, the Board relies on the "lore of the shop" to conclude that past practices continue to repress employee sentiment despite turnover.

By so limiting its consideration of the events following the unfair
labor practices, the Board cannot make the necessary detailed findings

27

about the possibility of conducting a fair election years after the
unfair labor practices occurred. Moreover, and perhaps more impor-
tantly, in taking this position, the Board refuses to follow the clear
and established precedent of this Circuit that both the passage of time
and employee turnover are highly relevant matters to be considered.

On the passage of time we have stated:

> It strains credulity to believe that [a company's] unfair labor
> practices, such as they were, had such long lasting effects
> that a fair rerun election could not have been held four years
> later, much less today, some six years after the original vio-
> lations occurred.

*Be-Lo*, 126 F.3d at 282. We have found that even more telling than
the passage of time is the turnover of employees:"`Significant
employee turnover through normal attrition' is highly relevant to
determining the necessity of a bargaining order and well `may make
a bargaining order inappropriate.'" *Id.* (quoting *NLRB v. So-Lo Foods*,
985 F.2d 123, 128-29 (4th Cir. 1992)). As we explained:

> Not only is the possibility of a fair rerun election great when
> many of the intimidated employees have moved on and been
> replaced by new workers who have not witnessed the com-
> pany's unfair labor practices, but the issuance of a bargain-
> ing order in the face of significant employee turnover risks
> unjustly binding new employees to the choices made by for-
> mer ones.

*Be-Lo*, 126 F.3d at 282-83 (internal quotation marks and citations omit-
ted).[4]

---

[4] The Board concluded that even though a "significant number of
employees" had left Overnite's employ since the unfair labor practices,
the practices nevertheless "live on in the lore of the shop and continue
to repress employee sentiment long after most, or even all, original par-
ticipants have departed." *Overnite Transp.*, 329 N.L.R.B. at 5 (quoting
*Bandag, Inc. v. NLRB*, 583 F.2d 765, 772 (5th Cir. 1978)). But we have
rejected this reasoning as speculative. "Absent substantial evidentiary

support that the effects of unlawful practices have in fact
continued to be

28

The evidence in the record here indicates a substantial passage of time and employee turnover. At the four locations at issue, the turn-over, as of early 1999, was anywhere from 29% to 40%. In addition, most of the executives involved in the unfair labor practices had left. The period of time elapsing between the unfair labor practices and the Board's order was almost five years and by now would be over six years. Moreover, the unfair labor practices which were supported by substantial evidence were settled in July 1995. After the settlement, Overnite took steps to avoid future unfair labor practices, which the record indicates were effective.

It is also telling that fair reelections were found to have been con-ducted at several other sites which were similarly influenced by Over-nite's unfair labor practices. For instance, at Memphis, Toledo, and Moonachie, where the same national and local unfair labor practices occurred, the General Counsel and the Teamsters withdrew their request for *Gissel* orders and proceeded with new elections. The Teamsters won the elections at Toledo and Memphis and lost the election at Moonachie. All of those elections were certified as free and fair.[5]

In sum, the Board did not and could not, on the evidence in the record, fulfill the requirements for the scrupulous specificity demanded by our precedents for imposing *Gissel* orders. Indeed, if its analysis had been complete, it would have had to come to terms with the fact that a fair election rerun was available at each of the four locations in question. The approval of such orders without satisfying

---

felt in the workplace, we believe that such inferences as to the likely effect of ``lore of the shop'' have no place in the calculus of whether a mandatory bargaining order is warranted." *Be-Lo*, 126 F.3d at 283. We have noted that this type of speculation "eviscerate[s] one of the most important of the heightened requirements for a *Gissel* category II manda-tory bargaining order." *Id.*

[5] In Cincinnati, where the General Counsel reserved the right to seek a *Gissel* order, the Teamsters agreed to proceed to a new election, which it lost. After the Teamsters objected to that election based

on the January
1996 productivity package, a third election was conducted which the
Teamsters won. That election too was certified by the Board.

29

ourselves that new elections could not remedy the unfair labor practices found by the Board would undermine labor law's fundamental policy of democratic representation. For these reasons, we refuse to enforce the *Gissel* orders at these locations.

## IV

In sum, we conclude that the Board's findings that Overnite committed unfair labor practices in implementing its March 1995 wage increase and in conducting its election campaigns at Bridgeton, Norfolk, Louisville, and Lawrenceville were supported by substantial evidence. We conclude that the Board's finding that Overnite committed unfair labor practices in implementing its January 1996 wage increase was not supported by substantial evidence. And we remand the findings with respect to the attorney questions posed to employees at the Louisville service center for further proceedings.

In addition, we conclude that the requirements for imposing *Gissel* orders at the four locations were not found and could not be found on this record. Therefore, we refuse to enforce any *Gissel* orders at Bridgeton, Norfolk, Louisville, and Lawrenceville.

Accordingly, we grant in part and deny in part Overnite's petition for review; we deny the Board's cross-application for enforcement insofar as it is inconsistent with this opinion; and we remand for new elections at the four sites and for entry of such other order as is appropriate but not inconsistent with this opinion.

*IT IS SO ORDERED.*

GREGORY, Circuit Judge, concurring in part and dissenting in part:

As for the National Labor Relations Board's findings of unfair labor practices, I agree with the majority in some respects, and with the dissent in others. I also concur with the majority that the record does not support the issuance of bargaining orders. I respectfully dissent, however, from the majority's refusal to remand the case to the Board for reconsideration.

30

## I

### A

I believe substantial evidence supports the Board's findings that Overnite's conduct at the four service centers and its March 1995 discriminatory wage increase violated § 8(a)(1) of the National Labor Relations Act. *See NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409 (1964). In this respect, I concur with all of my good colleagues. I also concur with the majority opinion insofar as it holds that Overnite's presentation of the wage increase in December 1995 to its employees did not violate §§ 8(a)(1) or 8(a)(5) of the Act. *See Americare Pine Lodge Nursing & Rehab. Ctr. v. NLRB*, 164 F.3d 867, 875-76 (4th Cir. 1999).

### B

I agree with my dissenting colleagues, however, that Overnite committed unfair labor practices in granting the 1996 wage increase. First, as Judge King indicates, an employer violates §§ 8(a)(1) and 8(a)(5) of the Act when it unilaterally changes the terms or conditions of employment under negotiation. *NLRB v. Katz*, 369 U.S. 736, 743 (1962). Whether a yearly wage increase constitutes a term or condition of employment turns on whether the increase has become a "reasonable expectation" of the employees. *Phelps Dodge Mining Co. v. NLRB*, 22 F.3d 1493, 1496 (10th Cir. 1994). There is substantial evidence in the record to support the Board's finding that the wage increase had become a reasonable expectation and that Overnite therefore changed the terms and conditions of employment of the represented employees by not extending the 1996 wage increase to them. *Overnite Transp. Co.*, 329 N.L.R.B. 1, 106-09 (Nov. 10, 1999). That Overnite tied the wage increase to a productivity package does not undermine the Board's conclusion. As the ALJ found, Overnite's practice of granting yearly wage increases was largely driven by the need to maintain competitive wages. *Id.* The company's desire to make other productivity improvements—knowing that these changes would increase discontent among its employees—merely reinforced the need to continue the practice; it did not fundamentally alter the

nature of the practice.

Second, Overnite violated §§ 8(a)(1) and 8(a)(3) of the Act by discriminating in regard to the terms and conditions of employment in order to discourage union membership. There is substantial evidence in the record to support the Board's finding that Overnite's discriminatory 1996 wage increase was unlawfully motivated and therefore in violation of the Act. *Overnite*, 329 N.L.R.B. at 109-10.

## C

The majority and the dissent also disagree over whether two of the attorneys' questions were coercive and therefore in violation of § 8(a)(1) of the Act. I agree with the majority that the first question was not coercive and with the dissent that the second question was coercive. The first question asked:

> If you didn't sign the card or petition the first time you were
> asked, why did you sign it when you were asked to do so
> again?

*Overnite*, 329 N.L.R.B. at 62. We have previously held that "[e]mployers are free to ask employees about their sentiments regarding a union provided the questioning is not coercive." *Standard-Coosa-Thatcher Carpet Yarn Div., Inc. v. NLRB*, 691 F.2d 1133, 1137 (4th Cir. 1982). This question was not particularly coercive on its face, and the interviewees were given multiple assurances that there would be no retaliation. Like the majority, I would hold that the Board's finding that this question was coercive is not supported by substantial evidence. *See Johnnie's Poultry Co.*, 146 N.L.R.B. 770, 775 (1964); *NLRB v. P.B. & S. Chem. Co.*, 567 F.2d 1263, 1267 (4th Cir. 1977).

Unlike the first, the second question was coercive. The second question asked:

> Did anyone from the Union tell you it was important for you
> to report to the Union or any employee any problems you
> had with the Company since the Union needed unfair labor
> practice charges to help them overturn the election? If so,
> who?

32

*Overnite*, 329 N.L.R.B. at 62. As Judge King points out, this question exceeds Overnite's "legitimate purposes for questioning employees." The question was particularly coercive because it pried into the employees' participation in organizing activities — protected conduct under the Act. 29 U.S.C. § 157; *Overnite*, 329 N.L.R.B. at 113. Accordingly, it was unlawful.

## D

Next, I think there is substantial evidence in the record to support the Board's finding that Overnite violated § 8(a)(1) of the Act by "granting to unrepresented employees the overtime portion of the productivity package in order to dissuade them from seeking union representation." *Overnite*, 329 N.L.R.B. at 5. Neither the majority nor the dissent specifically addresses the overtime benefit. The Board affirmed the finding of the ALJ, who stated:

> Overtime was an issue that was widespread in the campaign, and [Overnite's] offer was an obvious response to the complaints of the employees and, in fact, could be anticipated from many of Douglas's conversations with employees early in 1995. It would have been difficult for him to renege on his promises without further erosion of employee support.

*Overnite*, 329 N.L.R.B. at 111. Despite Overnite's contention that it intended to shorten hours and therefore rarely pay overtime, the overtime provision was a new benefit in the form of premium pay. Like the unlawful 1995 wage increase, the grant of overtime pay violated § 8(a)(1) of the Act because it was intended to discourage union organization. *Id.*; *see Exchange Parts*, 375 U.S. at 409; *J.P. Stevens & Co. v. NLRB*, 461 F.2d 490, 492 (4th Cir. 1972).

## II

I agree with the majority that we cannot enforce the bargaining orders on the current record, but I dissent from the majority's decision not to remand to the Board for reconsideration of its bargaining orders. The Board may very well reach the same conclusion after fur-

33

ther consideration, and we should allow for the possibility that bar-
gaining orders might yet be warranted.

We grant considerable deference to the Board's choice of remedy
for unfair labor practices. *Virginia Elec. & Power Co. v. NLRB*, 319
U.S. 533, 540 (1943); *NLRB v. Williams Enters. Inc.*, 50 F.3d 1280,
1289 (4th Cir. 1995); *NLRB v. So-Lo Foods, Inc.*, 985 F.2d 123, 126
(4th Cir. 1992). Judge King correctly indicates that "the Board's
`choice of remedy must . . . be given special respect by reviewing
courts' considering the Board's `fund of knowledge and expertise all
its own.'" *So-Lo Foods*, 985 F.2d at 126 (quoting *NLRB v. Gissel
Packing Co.*, 395 U.S. 575, 612 n.32 (1969)). This deference, how-
ever, is conditional. In order for us to perform our proper role in
reviewing agency action, the Board must make its reasoning clear on
the record, and that reasoning must be consistent with our statements
of the law. *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 899 n.9 (1984);
*NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 265-67 (1975). Here, in
addition to the errors noted above, and for reasons identified by the
majority, the Board has failed to engage in the reasoned decision-
making process we demand for issuance of *Gissel* bargaining orders.
*NLRB v. Apple Tree Chevrolet, Inc.*, 671 F.2d 838, 840 (4th Cir.
1982). Specifically, the Board has not adequately considered the dis-
sipation of the effects of the unlawful practices in determining
whether fair elections are now possible. The Board failed to fully
examine the mitigating effects of employee and management turnover
and the passage of time. Further, the Board inappropriately relied on
conclusory statements such as "the lore of the shop," *Overnite*, 329
N.L.R.B. at 5 (quoting *Bandag, Inc. v. NLRB*, 583 F.2d 765, 772 (5th
Cir. 1978)), to explain why the effects of prior illegalities had not dis-
sipated. We would be forsaking our responsibilities if we upheld bar-
gaining orders based on reasoning such as this.

I think the majority errs, however, in refusing to remand for recon-
sideration. When an agency fails to support its findings with adequate
reasoning, the agency is typically permitted to supplement its state-
ment of reasons. 3 Kenneth C. Davis & Richard J. Pierce, Jr., *Admin-
istrative Law Treatise* § 18.1 (3d ed. 1994). Similarly, when

an agency acts based on a misunderstanding of the law, the agency often may support the same action after considering the correct principles of law. *Id.* When it comes to fashioning a remedy for unfair labor

34

practices, the Board is particularly entitled to this opportunity. The Supreme Court has made it clear that we should not substitute our judgment for that of the Board in choosing an appropriate remedy:

> Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy.

*Sure-Tan*, 467 U.S. at 899 (quoting *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194 (1941)). If we cannot uphold the Board's initial choice of remedy, the proper disposition in most cases is remand to the Board for reconsideration. "Such action `best respects the congressional scheme investing the Board and not the courts with broad powers to fashion remedies that will effectuate national labor policy.'" *Sure-Tan*, 467 U.S. at 905 (quoting *NLRB v. Food Store Employees*, 417 U.S. 1, 10 (1974)).

Indeed, remand for reconsideration was the result in *Gissel* itself. After holding that the Board failed to support its issuance of a Category II bargaining order with record findings consistent with the relevant legal standards, the Court remanded the case to the Board for proper findings. *Id.* at 616. In doing so, the Court stated that it had been inappropriate for the court of appeals—this very circuit—to make contrary findings. *Id.* Since *Gissel*, we have recognized the need to remand for reconsideration when the Board has exceeded the scope of its remedial powers. *See Ultrasystems Western Constructors, Inc. v. NLRB*, 18 F.3d 251, 259 (4th Cir. 1994) ("[W]hen selection of the appropriate remedy is at issue, as it is here, the appropriate course to follow is to remand the case to the Board to fashion the remedy of its choosing."); *NLRB v. D&D Enterprises, Inc.*, 125 F.3d 200, 209 (4th Cir. 1997) (remanding to Board for reconsideration of whether prior unfair labor practices continued to influence employees' support of union for purposes of decertification). *See also Baltimore Sun Co. v. NLRB*, 257 F.3d 419, 432 (4th Cir. 2001) (King, J., dissenting).

The majority demonstrates that bargaining orders are not support-
able on this record, but does not foreclose that there may be "substan-
tial evidentiary support [not yet made part of the record] that the

35

effects of unlawful practices have in fact continued to be felt in the workplace," *Be-Lo Stores v. NLRB*, 126 F.3d 268, 283 (4th Cir. 1997). If given the chance, the Board might consider a number of factors on remand. For example, the particular structure of the company may play a part in whether the effects lingered. Although it seems somewhat counterintuitive for a trucking company like Overnite, employee turnover and the passage of time may not have had the effect we typically presume. The record is simply inadequate for us to make a judgment. Additionally, Overnite's unlawful conduct may have actually *caused* some of the turnover. If that is so, the Board should be allowed to consider that fact in deciding whether to reissue a bargaining order. Moreover, even if the majority is correct that Overnite did not commit continuing violations after the elections, the company's later conduct (though lawful) may have had the effect of reinforcing the earlier unlawful acts. The Board should be allowed to consider this as well. We should hesitate before concluding that further input from the Board would be unhelpful.

I believe we should allow the Board to look before we leap. Accordingly, we should grant in part and deny in part Overnite's petition for review, deny the Board's cross-petition for enforcement, and remand to the Board so that it may supplement its reasoning and apply the appropriate legal standards. We should not take the extra step of limiting the Board's choice of remedies to new elections.

I respectfully concur in part and dissent in part.

36

KING, Circuit Judge, dissenting:

Since 1935, the National Labor Relations Board has been accorded the authority and responsibility for resolving our nation's labor disputes and remedying the effects of unfair labor practices, whether engaged in by corporate management or by labor unions. A necessary corollary to the Board's authority has been that our judicial branch of Government does not substitute its judgment for that of the Board. The Board, rather than the courts, is the labor expert, and the judiciary is obliged to defer to its expertise, monitoring the Board solely to ensure that it does not exceed its authority.

In approaching this long-standing and bitter dispute between Overnite Transportation Company and the Teamsters Union, the Board has applied its expertise, and it has concluded that Overnite engaged in a litany of unfair labor practices. It has also taken appropriate action, pursuant to its statutory authority and the Supreme Court's landmark decision in *NLRB v. Gissel Packing Co., Inc.*, 395 U.S. 575 (1969), ordering Overnite to bargain with the Union at four of its service centers. In reviewing this dispute, the en banc majority has concluded, and I agree, that substantial evidence supports the Board's findings that Overnite engaged in unfair labor practices in its discriminatory March 1995 wage increase, and that it also unlawfully interfered with organizing campaigns at the Lawrenceville, Louisville, Norfolk, and Bridgeton service centers. Regrettably, however, in its consideration of the other unfair labor practices found by the Board, and in its review of the Board's chosen remedy of *Gissel* bargaining orders, the majority has substituted its judgment for the expertise of the Board. In so doing, it has ignored controlling legal principles: we must defer to the Board on findings of fact supported by substantial evidence and, in the absence of an abuse of discretion, we must enforce the Board's chosen remedy for unfair labor practices. Because I strongly believe the Board's decisions to be appropriate under the law and on these facts, I would grant enforcement of its bargaining orders, and I respectfully dissent.[1]

_____

[1] Because I would uphold the Board's findings on the

unfair labor prac-
tices engaged in by Overnite, and because I would enforce each of its
*Gissel* bargaining orders, I adhere to the views expressed in the opinion
of the panel majority in this appeal. *Overnite Transp. Co. v. NLRB*, 240
F.3d 325 (4th Cir. 2001).

38

# I.

As the majority properly observes, the Board's findings of fact are conclusive so long as they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 490-91 (1951). Indeed, if an ALJ's factual findings, as adopted by the Board, are supported by substantial evidence, "our inquiry ends . . . even though we might have reached a different result had we heard the evidence in the first instance." *NLRB v. Daniel Constr. Co.*, 731 F.2d 191, 193 (4th Cir. 1984) (citation omitted). Our judiciary has consistently recognized that the Board must be accorded broad discretion in its crafting of remedies to resolve labor disputes. Accordingly, the Board's chosen remedy must be enforced by the judiciary "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the NLRA." *NLRB v. Williams Enters., Inc.*, 50 F.3d 1280, 1289 (4th Cir. 1995).

In my considered opinion, the en banc majority has inappropriately substituted its judgment for that of the Board in three crucial respects. In contravention of the Board's exhaustive findings of fact, the majority now incorrectly determines that:

> ! Overnite did not commit unfair labor practices when it instituted the discriminatory January 1996 wage increase.
>
> ! Overnite's coercive questioning of employees at its Louisville service center did not violate the Act.
>
> ! Overnite's litany of severe and pervasive unfair labor practices does not support the Board's chosen remedy of *Gissel* bargaining orders.

In order to support these determinations, the majority has erroneously re-weighed the evidence relating to each of these important issues. First, there is more than substantial evidence to support the Board's findings, in connection with Overnite's discriminatory January 1996 wage increase, that Overnite bypassed the Union, discriminated

39

against union employees, and publicized its unlawful conduct. Second, there is also ample evidence to support the Board's finding that Overnite's coercive questioning of employees at Louisville exceeded any legitimate purpose. Finally, and most significantly, the evidence overwhelmingly demonstrates that the Board did not abuse its discretion in its issuance of *Gissel* bargaining orders to remedy Overnite's anti-union conduct at four of its service centers.

The majority sees the *Gissel* bargaining orders as undermined by mitigating factors, including the lack of continuing misconduct, the employee turnover rate, the passage of time, and the success of the Union in elections at other service centers. The Board, however, carefully considered each of these factors, and it ruled against Overnite. Its Decision and Order should be enforced. *Overnite*, 329 N.L.R.B. 1 (Nov. 10, 1999).

I will address these three issues in turn.

## II.

My first disagreement with the en banc majority relates to its conclusion that Overnite's discriminatory January 1996 wage increase did not violate the Act. Although the majority acknowledges that Overnite committed unfair labor practices in its discriminatory March 1995 wage increase and in its pervasive "carrot and stick" campaigns at the Lawrenceville, Louisville, Norfolk, and Bridgeton service centers, it erroneously concludes that Overnite's unfair labor practices ceased in mid-1995. I am compelled to disagree: there is more than substantial evidence to support the Board's finding that the discriminatory January 1996 wage increase violated three subsections of the Act, i.e., §§ 8(a)(1), (3), and (5).[2] Indeed, the detailed findings made

---

[2] Section 8 of the Act sets forth the statutory definitions of the unfair labor practices in this case, providing in pertinent part as follows:

> It shall be an unfair labor practice for an employer—
>
> (1) to interfere with, restrain, or coerce employees in the exercise of the rights [to engage in union activities] . . .;

. . .

40

by the ALJ and the Board[3] reflect that: (1) Overnite bypassed the Union by giving it only one day to consider the proposed January 1996 wage increase and the related productivity agreement before making its presentation directly to employees; (2) Overnite made a unilateral change to its employees' terms and conditions of employ- ment by awarding the January 1996 wage increase to non-union employees only; and (3) Overnite thereafter distributed anti-union campaign fliers boasting that its union employees were being paid less than its non-union employees.

A.

In December 1995, Overnite offered its employees a fifty-cent-per- hour wage increase. This wage increase, however, was conditioned on acceptance by the Union of the related productivity agreement whereby Overnite would have the right, inter alia, to "`[s]et, change and cancel days and hours of work' for all job classifications; and, within certain limitations, to `[s]et . . . schedules, routes, and running times.'" *Overnite*, 329 N.L.R.B. at 57. Overnite gave the Union virtu- ally no notice of the proposed productivity agreement, nor any time to consider it. In this connection, the ALJ found that Overnite had effectively bypassed the Union, as follows:

_____

> (3) by discrimination in regard to hire or tenure of employ-
> ment or any term or condition of employment to encourage
> or discourage membership in any labor organization . . .;
>
>                                 . . .
>
> (5) to refuse to bargain collectively with the representa-
> tives of his employees . . . .

29 U.S.C. § 158.

[3] In this opinion, I generally refer to the findings of the Board and the ALJ interchangeably, except as otherwise noted, because the Board, in its Decision and Order of November 10, 1999, affirmed the findings made by the ALJ in his Decision of April 10, 1998. *See Overnite*, 329 N.L.R.B. at 1 ("The Board has . . . decided to affirm the [ALJ's] rulings, findings, and conclusions as modified . . . .").

41

> What Overnite did here was to send by overnight mail its
> productivity agreement to the Union, wait 1 day, and then
> make its presentation to the employees directly, 2 days
> before negotiations were to or did resume. *That bypasses the*
> *Union in the same way as if [Overnite] never made any pro-*
> *posal at all to the Union*, and [Overnite] certainly gave the
> Union no adequate opportunity to digest the proposal or to
> respond or to begin discussion.

*Id.* at 58 (emphasis added). Indeed, Overnite had been planning to implement its productivity changes for at least two months before it notified the Union of the proposal, at the last minute, by overnight mail. Overnite's clear goal was to circumvent the Union, and the company admitted as much following presentation of the productivity package in Atlanta. Mr. Schager, Overnite's Atlanta manager, explained to an employee that "[w]e don't, we won't notify the Union any more on anything. That's the whole point of this on the produc-tivity package and so forth. We now will make changes as we see 'em . . . ." *Id.* at 58 n.95. Based on its thorough review of the evidence, the ALJ found that Overnite had "concluded that it would be `much more effective' to make the productivity package palatable by dealing directly with the unionized employees rather than having to deal only with their bargaining representatives; and so the conscious effort was made to bypass the national committee." *Id.*

This anti-union activity of Overnite constituted a clear violation of §§ 8(a)(1) and (5) of the Act, which prohibit an employer from bar-gaining directly with employees that are represented by a union. *See Medo Photo Supply Corp. v. NLRB*, 321 U.S. 678, 684 (1944) (explaining that employer violates § 8(a)(1) of the Act when it "ignor-[es] the union as the employees' exclusive bargaining representative, by negotiating with its employees concerning wages at a time when wage negotiations with the union were pending, and by inducing its employees to abandon the union by promising them higher wages"); *see also Holly Farms Corp. v. NLRB*, 48 F.3d 1360, 1368 (4th Cir. 1995). The Board's finding of this unfair labor practice, i.e., Overnite bypassing the Union and seeking to bargain directly with its repre-

sented employees, is supported by more than substantial evidence. In
rejecting it, the majority has simply substituted its judgment for that
of the Board.

42

B.

Ultimately, the Union's national committee rejected the proposed productivity agreement and Overnite, in January 1996, unilaterally granted the fifty-cent-per-hour wage increase to its non-union employees only. The Supreme Court has long recognized that an employer violates §§ 8(a)(1) and (5) of the Act when it makes unilateral changes to established terms or conditions of employment. *NLRB v. Katz*, 369 U.S. 736, 743 (1962). Accordingly, when an employer, by its promise or course of conduct, has made an annual wage increase part of an established wage or compensation system, it cannot change or terminate the benefit unilaterally during the period of collective bargaining. *See First Nat'l Maint. Corp. v. NLRB*, 452 U.S. 666, 674-75 (1981); *Dorsey Trailers, Inc. v. NLRB*, 233 F.3d 831, 838 (4th Cir. 2000).

In this connection, there is more than substantial evidence to support the Board's finding that, by not providing the January 1996 wage increase to its union employees, Overnite changed the terms and conditions of their employment and hence violated the Act. As the ALJ explained, Overnite had theretofore consistently provided its employees with annual wage increases: "Since 1980, Overnite had a regular practice of granting across-the-board annual wage and mileage increases to all its employees. That was never broken." *Overnite*, 329 N.L.R.B. at 58.

The en banc majority, to its credit, candidly acknowledges that substantial evidence supports the Board's finding that Overnite had historically provided its employees with annual wage increases. The majority then finds, however, in contravention of the deferential standard of review to be accorded the Board, that "the *nature* of the wage increases was not sufficiently fixed to become a `term or condition of employment.'" *Ante* at 19. Its basis for this finding appears to be that Overnite did not award a wage increase in 1991, and that its 1994 wage increase was awarded as part of a Performance Incentive Plan.

This finding by the majority is, for several reasons, fatally flawed. First, it is incorrect to say that the 1991 wage increase was not

awarded. While the 1991 increase was due to be implemented in
October 1991, it was delayed for three months until January 1992.

43

Subsequently, from 1992 onward, the annual wage increase was made in January. Thus, as the ALJ specifically found,"[e]xcept for that one 15-month period, increases ha[d] been given every 12 months." *Overnite*, 329 N.L.R.B. at 58 n.96. Second, the fact that the 1994 wage increase was awarded as part of the Performance Incentive Plan does not alter the fact that in each year since 1980, including 1994, Overnite had awarded its employees an annual wage increase. *See Eastern Maine Med. Ctr. v. NLRB*, 658 F.2d 1, 8 (1st Cir. 1981) (explaining that indefiniteness of amount, plus fact that company has "flavor of discretion," does not prevent annual wage increase from becoming term or condition of employment).

Without fail, Overnite awarded wage increases to its employees each year from 1980 through 1996, thus making it apparent to both the ALJ and the Board that an annual wage increase was a term and condition of employment with Overnite. As such, there is compelling and substantial evidence to support the Board's finding that Overnite, in denying the January 1996 wage increase to its union employees, made an illegal unilateral change to established terms and conditions of their employment.

C.

Finally, the en banc majority ignores compelling evidence that Overnite took affirmative steps to ensure that its discriminatory January 1996 wage increase would be noticed by its employees. The ALJ found that Overnite had "publicized the withholding of the increase to demonstrate that voting for the Teamsters presented serious, adverse consequences." *Overnite*, 329 N.L.R.B. at 60. And Overnite flaunted its actions, taunting the Union and its members by distributing anti-union "campaign flyers stating that employees in the represented units were 50 cents per hour behind nonunion employees after the 1996 wage increase and blamed the Union for refusing to allow the employees it represented to accept the increase and refusing to bargain about the increase." *Id.* Moreover, as the ALJ found, Overnite's anti-union propaganda continued well after January 1996: "[a]dditional flyers, apparently issued after [Overnite] increased

wages in *1997*, called attention to the fact that the nonunion employ-
ees earned 95 cents more than those represented by the Teamsters."
*Id.* at 60 n.103 (emphasis added). This uncontradicted activity on the

44

part of Overnite plainly contravened both §§ 8(a)(1) and (3) of the Act, which prohibit an employer from discriminating with regard to a term or condition of employment in order to encourage or discourage union membership. *See NLRB v. Great Dane Trailers*, 388 U.S. 26, 32 (1967) ("The act of paying accrued benefits to one group of employees while announcing the extinction of the same benefits for another group of employees who are distinguishable only by their participation in protected concerted activity surely may have a discouraging effect on either present or future concerted activity.").

### D.

This record compellingly indicates, with respect to Overnite's discriminatory January 1996 wage increase, that (1) it bypassed the Union and bargained directly with represented employees, in violation of §§ 8(a)(1), and (5); (2) it discriminated against the Union and its members by awarding the wage increase to non-union employees only, in violation of §§ 8(a)(1) and (5); and (3) it flaunted its illegal activities by blaming the Union for the wage differential between the union and the non-union employees, in violation of §§ 8(a)(1) and (3). Because there is more than substantial evidence supporting the Board's findings of these unfair labor practices, the en banc majority has erred in its decision to the contrary.

### III.

My second disagreement with the en banc majority concerns its assault on the Board's finding that certain questions asked by Overnite's attorneys to employees at its Louisville service center were coercive in nature, in violation of § 8(a)(1) of the Act. The majority vacates the Board's conclusion that two questions, submitted to the Louisville employees in preparation for the ALJ's hearing ("Attorneys' Questions"), were coercive in nature:

> ! If you didn't sign the card or petition the first time you were asked, why did you sign it when you were asked to do so again?
>
> ! Did anyone from the Union tell you it was important for you to report to the Union or any employee any problems

> you had with the Company since the Union needed
> unfair labor practice charges to help them overturn the
> election? If yes, who?

*Overnite*, 329 N.L.R.B. at 62.

Notwithstanding the majority's contention to the contrary, there is substantial evidence in this record to support the Board's finding that the Attorneys' Questions violated the Act. In *Johnnie's Poultry Co.*, 146 N.L.R.B. 770 (1964), the Board set forth specific rules under which an employer may interview an employee in preparing a defense to an unfair labor practice allegation. Among other things, "the questions must not exceed the necessities of the legitimate purpose by prying into other union matters, eliciting information concerning an employee's subjective state of mind, or otherwise interfering with the statutory rights of employees." *Id.* at 775; *see also Standard-Coosa-Thatcher Carpet Yarn Div., Inc. v. NLRB*, 691 F.2d 1133, 1141 n.8 (4th Cir. 1982) (quoting *Johnnie's Poultry Co.* ). As the ALJ found, the first of the Attorneys' Questions inquired why the employees signed the bargaining cards, thus impermissibly probing the employees' subjective states of mind. *Overnite*, 329 N.L.R.B. at 62. Indeed, the majority acknowledges as much, noting that it is "possible" that the ALJ was correct in determining that Overnite was improperly inquiring into the employees' subjective reasoning. *Ante* at 23. The second of the Attorneys' Questions is impermissible because it exceeded Overnite's legitimate purposes for questioning employees. *Overnite*, 329 N.L.R.B. at 62. Although Overnite was entitled to determine whether there was an improper inducement in the Union's procurement of bargaining cards, its second question pried into unrelated matters, asking whether anyone from the Union had asked the employees to report unfair labor practices.

Rather than according the Board deference on the Attorneys' Questions, the en banc majority has substituted its own finding for that of the Board. It has long been settled, however, that the Board "may draw reasonable inferences from the evidence." *Owens-Corning Fiberglas Corp. v. NLRB*, 407 F.2d 1357, 1362 (4th Cir. 1969). And it was entirely reasonable for the Board to conclude that

the Attor-
neys' Questions probed the subjective intent of the employees and
exceeded Overnite's legitimate purposes. As such, the Board's find-

46

ing that Overnite's conduct in connection with the Attorneys' Questions constituted an unfair labor practice is supported by substantial evidence.

## IV.

I turn now to my most fundamental disagreement with the en banc majority: its refusal to enforce the Board's *Gissel* bargaining orders. While the majority properly agrees that Overnite engaged in severe and pervasive unfair labor practices that dissipated union majorities at Lawrenceville, Louisville, Norfolk, and Bridgeton, it nevertheless finds the presence of mitigating factors — the lack of continuing misconduct, the employee turnover rate, the passage of time, and the success of the Union in elections at other service centers — sufficient to demonstrate that fair elections could have been held at these four locations. The majority also finds that the Board failed to develop an adequate record on the possibility of holding fair elections at those four service centers. In so finding, the majority has failed to adequately consider three controlling points: (1) the broad discretion possessed by the Board in remedying such severe and pervasive labor violations; (2) the extent to which its four mitigating factors fail to limit the effects of Overnite's anti-union activity; and (3) the extensive record supporting issuance of the *Gissel* bargaining orders. As such, the en banc majority again fails to accord the Board its proper deference.

### A.

#### 1.

Our courts have consistently recognized that the Board possesses broad discretion to craft appropriate remedies in unfair labor practice cases. Indeed, the Board's chosen remedy must be enforced "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the NLRA." *NLRB v. Williams Enters. Inc.*, 50 F.3d 1280, 1289 (4th Cir. 1995). Notwithstanding the favored status of elections, the Board — given its "fund of knowledge and expertise" — must be accorded the special respect it is due in its fashioning of a remedy. *NLRB v. So-Lo*

*Foods, Inc.*, 985 F.2d 123, 126 (4th Cir. 1992) (quoting *Gissel*, 395

47

U.S. at 612 n.32). Obviously, the more severe and pervasive the
unfair labor practices, the greater the scope of appropriate remedial
measures.

2.

In the Supreme Court's unanimous decision in *NLRB v. Gissel*, rendered over thirty years ago, Chief Justice Warren recognized the Board's authority (and obligation) to issue remedial bargaining orders in two distinct situations. First, such orders may be appropriate in "Category I" cases, where "exceptional," "outrageous," and "pervasive" unfair labor practices have occurred, and where the coercive effects of such practices "cannot be eliminated by the application of traditional remedies." *Be-Lo v. NLRB*, 126 F.3d 268, 274 (4th Cir. 1997) (quoting *Gissel*, 395 U.S. at 613-14). Second, and more typically, remedial bargaining orders may be issued by the Board in so-called "Category II" cases, where the Board has found that: (1) the Union once had majority status; (2) such majority status was dissipated by the employer's pervasive misconduct; (3) there is only a slight possibility of erasing the effects of these past pervasive practices and ensuring a fair election; and (4) employee sentiment would, on balance, be better protected by issuance of a bargaining order. *NLRB v. Appletree Chevrolet, Inc.*, 608 F.2d 988, 996 (4th Cir. 1979) (citing *Gissel*, 395 U.S. at 614).

In fashioning a remedy in Category II *Gissel* cases, the Board must consider the scope and severity of the unfair labor practices, with an eye to their past effect on election conditions and the likelihood, if any, of their recurrence. *See Gissel*, 395 U.S. at 614. If the Board concludes that a fair election cannot be adequately ensured by traditional remedies, and if "employee sentiment once expressed through [union authorization] cards would, on balance, be better protected by a bargaining order," then as Chief Justice Warren observed, "such an order should issue." *Id.* at 614-15.

B.

In this situation, the Board classified Overnite's misconduct against the Union and its employees as a Category II case, and it proceeded

to issue *Gissel* bargaining orders for the service centers at

48

Lawrenceville, Louisville, Norfolk, and Bridgeton. The majority recognizes that the Union had obtained signed card majorities before the earlier elections at the four service centers, and that the Union's majority status at those locations was dissipated by Overnite's repeated unfair labor practices. *Ante* at 27. After re-weighing the evidence, however, the majority has decided that the Board should have found that fair elections could have been conducted at the four service centers, and, as such, it has determined that the *Gissel* bargaining orders are unwarranted. In fact, the Board's record contains a litany of both national and unit-specific violations of the Act by Overnite. And, as we have observed, the scope of appropriate remedial measures is necessarily enhanced, as a matter of course, when the Board is addressing severe and pervasive unfair labor practices. Overnite's anti-union activities — both nationally and at the four service centers — are more than sufficient to support the Board's conclusion that fair elections could not be held at the four locations. In order to explain this position fully, I am constrained to further review the extensive evidentiary record compiled by the Board.

### 1. *National Hallmark Violations*

In making its decision on the *Gissel* bargaining orders, the Board emphasized the numerous "hallmark violations" committed by Overnite. Hallmark violations are those unfair labor practices "so coercive that their presence will support issuance of a bargaining order unless some significant mitigating circumstance exists." *So-Lo Foods*, 985 F.2d at 126 (quoting *NLRB v. Jamaica Towing*, 632 F.2d 208, 212-13 (2d Cir. 1980)). Where hallmark violations have been committed, the seriousness of the employer's conduct justifies a finding — without extensive explication — that the unlawful activity is likely to have a lasting inhibitive effect on union elections. *Id.*

The Board found hallmark violations present in Overnite's "highly coercive `carrot and stick' campaign," in which it granted selective wage increases to its unrepresented employees, while simultaneously communicating the futility of union negotiations and the likelihood of plant closures and job losses. *Id.* at 3. As the Board recounted with

respect to Overnite's wage manipulations:

> [I]n March 1995, at the height of the organizational effort,
> [Overnite] unlawfully granted its unrepresented employees

49

> an unprecedented wage increase, just months after the
> employees had received their normal (January) increase. . . .
> At approximately the same time that [Overnite] was illegally
> rewarding its unrepresented employees, [Overnite] pro-
> claimed in the company newsletter that "unfortunately"
> employees at the "four certified centers" where the Union
> had recently won Board elections "will not get these pay
> increases," but "will have to wait for negotiations." . . . *The*
> *message that [Overnite's] combined actions sent to employ-*
> *ees was unmistakably clear: they could choose to remain*
> *unrepresented and enjoy any pay increase [Overnite] may*
> *grant in the future, or they could vote for union representa-*
> *tion and forego such benefits.*

*Id.* (emphasis added).

Although the discriminatory March 1995 wage increase reflected Overnite's strong hostility to the Union's organization efforts, it was not an isolated occurrence. Indeed, as the Board found, Overnite "again distinguished among its service centers based on their union or nonunion status" in granting its wage increase the following year. *Id.* In January 1996, Overnite again publicly withheld its wage increase from employees at union-represented service centers, while distribut-ing flyers blaming the Union for the lower wages of those bargaining units. *Id.* The Board's findings on this point characterized Overnite's tactics crisply: "[T]he message was clear: companywide wage increases would not be granted to employees who voted for the Union." *Id.*

In addition, Overnite's senior management threatened employees with the loss of their jobs if they voted for the Union. As the Board found, Jim Douglas, Overnite's President, personally travelled to more than fifty service centers in the course of implementing a nationwide anti-union campaign. He threatened that "a Union victory would `drive [Overnite] into nonprofit and put 14,000 jobs in jeop-ardy.'" *Id.* at 4. According to Douglas, a Union victory would jeopar-dize "the jobs and welfare benefits — everything." *Id.*

With this hostile anti-union atmosphere in mind, I turn to

Over-
nite's campaign of promises and threats at the four service
centers

50

subject to the *Gissel* bargaining orders — Lawrenceville, Louisville,
Norfolk, and Bridgeton.

### 2. *Unit-Specific Violations*

#### a. Lawrenceville

A representation election was conducted at Overnite's Lawrenceville, Georgia, service center in April 1995. The Union lost
the election by only four votes, forty-two to thirty-eight, and it filed
timely objections to Overnite's pre-election misconduct. The ALJ and
the Board then found that Overnite had engaged in a series of unfair
labor practices during the election campaign. For example, it
restricted access to bulletin boards that had previously been available
for employee postings. Overnite's "purpose was to discourage the
employees in their campaign[,]" and the ALJ concluded that Overnite
had thereby violated § 8(a)(1) of the Act. *Overnite*, 329 N.L.R.B. at
34. The Board found a litany of anti-union activity by Overnite at
Lawrenceville, including:

> ! Lawrenceville manager Bill Carter "gave the impression
> to [an employee] that he was monitoring the union activ-
> ities." *Id.*

> ! Carter announced to a group of employees that he had
> attended a management conference, and that Overnite,
> under Douglas's management, was pursuing solutions to
> employee complaints regarding such issues as overtime
> policies and uniforms. The ALJ found that Carter's state-
> ments "unlawfully promised benefits in order to discour-
> age employees from supporting the [Union]." *Id.*

> ! Carter threatened to get rid of employees if they voted to
> be represented by the Union. *Id.* at 35. Indeed, he admit-
> ted telling two employees that he could have fired them
> for certain incidents; if they were to vote in the Union,
> he would not be as lenient. *Id.*

> ! An Atlanta manager, Roger Schager, conducted several
> mandatory meetings for the Lawrenceville employees at

51

which he made illegal threats of closure and employee job loss. He projected that if Overnite had to operate under a Union contract, it would be forced to go out of business. He also warned that other trucking companies had not been able to survive unionization. *Id.*

! After screening an anti-union film at one such meeting, Schager reportedly told an employee: "[I]f you want a Union job why don't you go and get a Union job with a company that is a Union company." *Id.* at 36. On another occasion, he unlawfully offered to help employees get jobs with union carriers if they were dissatisfied with Overnite's non-union status. *Id.*

! Schager also recounted the Chicago experience to a group of employees; Schager told them that the Chicago unit still did not have a contract after protracted negotiations, but he neglected to mention Overnite's culpability. *Id.* As the ALJ observed, "[b]y Schager's omission of any reference to the Board's finding that Overnite bargained in bad faith, [Overnite] implied that bargaining would be futile, lasting for years without any possibility of agreement." *Id.*

! Similarly, in March 1995, Lawrenceville dispatcher Mike Rivers told a group of employees that union employees at the Kansas City service center had not received the March 5 pay raise. He added that, based on what the company's lawyers had told him, Overnite would never sign a Union contract. Rivers asked the employees to look at what had happened at the Chicago service center, reminding them that the Chicago employees had been represented by the Union for ten to thirteen years and still did not have a contract. Like Schager, he advised Lawrenceville employees that all Overnite had to do was bargain in good faith. *Id.* at 37.

! In late March, Overnite's vice president of safety, Bobby Edwards, came to Lawrenceville and met with employees, speaking to them about Chicago in detail. Edwards

52

told them that the Chicago employees had voted for Union representation and had been in negotiations with Overnite for about ten years but still did not have a contract. Additionally, he emphasized that employees at those service centers that had voted for Union representation in 1994 and 1995 would not receive the March 1995 pay raise because the raise was subject to collective bargaining. *Id.*

! At another meeting, Edwards repeated the remarks about Chicago, adding that all Overnite had to do was negotiate in good faith. Edwards also announced that the employees at the service centers that had voted for Union representation before March 5 would not receive the pay raise because it was "on the negotiating table." *Id.*

! While visiting the Lawrenceville service center, President Douglas suggested to employees that they serve on committees to come up with better ways to spend employee benefit funds. This, the ALJ found, "amounted to soliciting grievances from employees with a promise to redress them." *Id.* at 38. Douglas further threatened "that management would change its attitude in the way it enforced its work rules" if the Union won. *Id.* Douglas advised one employee that if the Union's campaign were successful, everything, including the employees' jobs and benefits, would be jeopardized. *Id.*

### b. Louisville

A coordinated Union organizing effort began at the Louisville service center in early October 1994. By late November, managers were soliciting employee grievances, in violation of § 8(a)(1) of the Act. A representation election was held in March 1995, and the Union lost by only two votes, eighty-five to eighty-three. The Board found that Overnite management, during the period leading to the representation election, engaged in numerous unlawful measures to alternately appease and threaten its Louisville employees. Overnite's anti-union conduct at Lawrenceville, as found by the Board, included the following:

53

! Louisville manager Dave Harmeier conducted a series of employee meetings, some impromptu and some mandatory, in which he promised to be responsive and encouraged employees to give Douglas's "new vision" a chance. *Id.* at 39.

! Following this positive introduction, Douglas made a personal appearance at the Louisville service center a week before the scheduled election (about March 9 and 10). Douglas assured employees that he "was going to try and `straighten stuff out,'" and he specifically mentioned the wage increase and improved benefits. The ALJ found that, in the context in which they were extended, Douglas's promises were intended to dissuade employees from supporting the Union. *Id.*

! In tandem with these rosy promises, management "warned of the harm to employees that would result if the Union were successful." *Id.* at 40. One supervisor warned employees that Overnite would "play hardball" if the Union won, and that everyone would have to work harder. *Id.* Another supervisor projected that "we'd all be out of work" if the Union were voted in. In short, the ALJ found that Overnite "threaten[ed] employees with the loss of their jobs and more onerous working conditions if they selected the [Union] as their bargaining representative." *Id.*

! At one mandatory meeting, Vice President Edwards reported that the Union had won in Chicago in 1984, and he falsely stated that Overnite had been bargaining in good faith since then. Edwards added that all Overnite was obliged to do was offer five days' sick leave and "that was bargaining in good faith." *Id.* If the Union were voted in, he projected, "then that means that [the Union] would start from scratch." *Id.* Edwards also said that at service centers that had voted in the Union, the pay raise would have to be negotiated, and if the Louisville employees voted in the Union, bargaining would be handled basically like negotiations in Chicago. *Id.*

54

! At another meeting, Edwards told the employees that the Chicago facility still did not have any kind of contract, and that it had been at least ten years since the employees voted the Union in. *Id.*

! Edwards discussed Chicago at yet another meeting, recounting how company representatives would show up, charges would be filed for bargaining in bad faith, Overnite would go to court and pay a small fine, and then it would not have to show up again until the following year. *Id.*

! On several occasions, Edwards and Harmeier made predictions about unionization to employees assembled for mandatory meetings. Once, Edwards pointed out that the Louisville employees would be receiving the March pay increase, but terminals that had voted a union in, such as Kansas City, would not because they would have to negotiate first. *Id.* Another time, Edwards opined that the only way union employees would get a contract was to go on strike, and if they did, they could be replaced. *Id.* Harmeier also stated that the only leverage the Union had in bargaining was to call a strike, and warned that the Union could do so without a vote by the employees. *Id.*

! Louisville supervisors also took measures to impede the employees' statutory right to distribute and read Union literature. The ALJ found that, on one occasion, a supervisor "literally pulled [Union] papers out of the hands of one employee who was reading it and threw it in the trash." *Id.* at 41.

! On the Friday night before the election, an Overnite supervisor told an employee that Harmeier had instructed him to get rid of all Union literature during the last week of the campaign. *Id.* At about the same time, a "Teamsters Graveyard" poster was put up in the break room, depicting the gravestones of unionized trucking compa-

55

nies; among them was an Overnite headstone with an open grave and a question mark. *Id.* at 21 n.10.

### c. Norfolk

The Union organizing campaign began at Overnite's Norfolk, Virginia, service center in January 1995, and a representation election was held in March 1995. The Union lost by a vote of fifty-eight to twenty-nine, and it objected to Overnite's illegal pre-election conduct. As in Lawrenceville, the ALJ found that Overnite violated the Act by preventing its Norfolk employees from posting union literature on company bulletin boards that had been made available for the employees' general use. *Id.* at 48. Norfolk manager Michael Mendenhall even threatened to fire employees for posting an NLRB form on one such bulletin board. *Id.* The ALJ found that Overnite engaged in a number of other anti-union practices leading up to the election at Norfolk, including:

> ! Supervisors told employees that, among the adverse consequences of voting in the Union, they would lose the March 5, 1995, pay raise. *Id.* at 47-48.

> ! Mendenhall told employees that the good things Overnite had planned would be postponed because the company would have to divert the funds to keep Overnite nonunion. *Id.* at 48. The ALJ further found that Mendenhall "gave some instructions about the way the union campaign was to be run," informing employees that "he would not stand for any union literature on *his* bulletin board." *Id.* (emphasis in original).

> ! In late February 1995, Mendenhall conducted a lengthy meeting attended by about twenty-five employees. He began the meeting by stating that the Union had filed a petition for an election and that any of the service centers that voted in the Union before March 5 would not receive the pay increase scheduled to take effect that day, because the increase could not be established in the absence of contract negotiations. He further remarked

56

that the service center in Chicago had not settled on a
contract after thirteen years of negotiations. *Id.*

! Mendenhall told employees that he would not tolerate
conversations about the Union while they were working
or at the workplace, and that if they did not comply with
that policy, they had better be careful. Prior to the Union
campaign, company policy was that employees could
talk to one another as long as their conversation did not
interfere with their jobs. *Id.* at 48-49 & n.72.

! During the week following the February meeting,
employee David Spaugh, an outspoken Union supporter,
asked Mendenhall how long it would be before he would
be fired if the Union lost the election. Mendenhall
replied: "Everyone will be held accountable." *Id.* at 49.
On March 14, Mendenhall told Spaugh and fellow
employee Rich Williams that Williams had become an
"agitator." *Id.* He warned that he did not want to see any-
thing bad happen to either of them because of the Union
campaign, and that they should be careful. *Id.*

! At various other mandatory meetings, Mendenhall made
additional predictions about the consequences of union-
ization. For example, he repeated that the Kansas City
employees would not be getting the March pay increase
because they had voted the Union in. *Id.* at 47. He also
boasted that in the thirteen years the Union had repre-
sented employees at the Chicago service center, there
had never been a contract. If the Union were to prevail
at Norfolk, he projected, the same scenario would play
out in Norfolk: "Overnite would negotiate in good faith,
but the employees would never get further than their
vote." *Id.* at 50.

! At one or more of the meetings, Mendenhall also told the
employees that if the terminal voted for Union represen-
tation, "business would be re-routed around them" and
their hours might be cut. *Id.* As an example, he cited the

57

experience at Kansas City, where "word was" that this
was happening. *Id.*

! On several occasions, Mendenhall threatened employees
with unspecified retaliation, letting them know that he
"was not going to stand for insubordination." *Id.* at 49.
Moreover, he was found to have denied pro-union employees the same opportunities to speak at the manda-
tory meetings as anti-union employees, "cut[ting] short
employees who made prounion comments or asked ques-
tions for clarification." *Id.* at 50.

! Management threatened employees with the loss of the
company's 401(k) pension plan. *Id.* at 49.

! In the weeks before the election, Norfolk supervisors
gave "Vote No" hats to those employees who were going
to vote against the Union, which the ALJ found to con-
stitute interrogation of employees about their union sym-
pathies. *Id.* at 49-50.

! In February, a supervisor told a group of eleven or
twelve employees that if the Union were to win, they
would lose their jobs. Moreover, if the Union were to
strike, they would lose their jobs and Overnite probably
would not call them back. *Id.* at 50. That same day, another supervisor told an employee that the employees
were going to get a fifty-cent-per-hour raise, but if the
Union were voted in, they would "lose it." *Id.* at 47.

! On March 14, a supervisor told a Norfolk employee that
he was "afraid" for himself and Overnite if the Union got
in. He expressed his concern that Overnite would not be
able to pay the Union scale, and that the employees should look at the union companies that had gone out of
business. *Id.* at 49.

! An employee complained that supervisors "`watched
[him] like a hawk' and stayed within listening distance."

58

*Id.* at 50. The ALJ determined that not only did supervi-sors create an impression of surveillance, but that "there was actual surveillance and monitoring in violation of Section 8(a)(1) of the Act." *Id.*

! The former Norfolk manager was sent to assist with the anti-union campaign. The ALJ found that he unlawfully "told employees that Douglas was working on improve-ments of the workplace and benefits, which was an implied promise of those improvements; impliedly prom-ised the termination of the [terminal manager], if that would change employees' prounion sympathies; and informed employees that strikes were inevitable." *Id.* at 51.

### d. Bridgeton

The Union began an organizing campaign when Overnite opened a new service center in Bridgeton, Missouri, in December 1994. A representation election was held on February 28, 1995, and the Union lost by only two votes, twenty-four to twenty-two. It then filed objec-tions to Overnite's pre-election misconduct. In January 1995, Bridge-ton manager Walter Grimes began illegally monitoring one of the most steadfastly pro-Union drivers — "even checking the bathroom" — to ensure that he was not engaging in organizational activities. *Id.* at 53. Along with illegal monitoring, the ALJ found numerous other pre-election violations by Overnite, including:

! Grimes removed union literature posted on the company bulletin board, left on tables in the break room and in the employee bathroom. While removing the pro-Union lit-erature, the manager allegedly remarked that he "[didn't] like to see that shit hanging on his board." *Id.*

! In January and February, local supervisors stifled con-versations between Union supporters and other employ-ees. On the other hand, conversations between anti-union employees and others were left undisturbed. Around the same time, Grimes asked a union supporter what the employees wanted. When that employee said overtime

and better benefits, Grimes responded: "They are in the
works." *Id.* at 54.

! Overnite's "troubleshooters" arrived in the Bridgeton-St.
Louis area around February 5 and stayed until February
14, riding with all the drivers except the two most active
union supporters. *Id.* at 53.

! One such troubleshooter, Andy Hamilton, told a driver
that Overnite wanted to make its employees happy,
accommodating them by improving benefits and inviting
more employee input. After the driver mentioned that
overtime would make the company a better place to
work, Hamilton assured him that it was in the works.
Hamilton also told the employee that he would look into
the idea of an employee committee that would participate
in selecting the benefit package, but advised him that
"we don't need a third party at Overnite." *Id.* at 53-54.
When another employee made similar suggestions about
benefits and overtime pay, Hamilton told him those
things were in the works. *Id.* at 54 n.83.

! During the pre-election period, Overnite sent the former
Bridgeton Manager Jeff Woods, Operations Director Morgan, and President Douglas to speak to the Bridgeton
employees. In February, Woods told employees that Overnite was looking into overtime and, although he could not make any promises, he was "pretty sure" it was
going to happen and that it was "almost a sure thing . . .
almost a done deal." *Id.* at 54. Woods warned that the
Union "would not work within the Overnite environment" and that, as a result, the benefit improvements
Overnite was trying to make would be lost. Finally, just
a week before the election, he urged employees to give
the new management a chance. *Id.*

! About two weeks before the election, Operations Director Morgan spoke at a mandatory meeting of about fifteen employees. He responded to questions about overtime pay by telling them that Douglas had taken

60

over as president and, although he could not promise
them anything because of the Union campaign, Douglas
was looking into these problems and devising solutions.
*Id.* On the same day, Morgan informed a group of
employees that it was not too late to come up with non-
union solutions to employee grievances. When one
employee remarked that other companies had better
wages and benefits, but that Overnite's profits were
higher, Morgan replied that these were the sorts of prob-
lems that they needed to present to Douglas, and that
they ought to give Jim a chance. *Id.* at 55.

! President Douglas made several visits to Bridgeton prior
to the election, speaking with employees about benefits,
including overtime pay. During one such conversation,
Douglas queried, "What if we gave you overtime at say,
over 45, 48 hours, but we maybe lessen [overall work-
load]," adding that they were looking into medical bene-
fits. Douglas proceeded to discuss the pros and cons of
overtime pay. *Id.* at 54.

! Two weeks before the election, Douglas held a meeting
with about twenty to twenty-five employees. He
announced that he wanted to know what was on their
minds, and that he was trying to change things for the
better. In response to employee questions about matters
such as overtime, uniforms, sick days, and medical bene-
fits, Douglas assured employees that he was looking into
such matters. The company, Douglas asserted, could take
care of its own and did not need third-party interference.
*Id.* at 55.

### 3.

As the Board found, Overnite was engaged, over an extended
period of time, in an ongoing national effort, characterized by unlaw-
ful anti-union activity, against the Teamsters. Simultaneously, Over-
nite pursued "highly coercive `carrot and stick' campaign[s]" at
Lawrenceville, Louisville, Norfolk, and Bridgeton. *Id.* at 3. Overnite
repeatedly solicited employee grievances with express or implied

promises to remedy them. It consistently reminded its workers that unionized employees would not receive the March 1995 wage increase, but would instead have to wait for negotiations. The frustrated negotiations in Chicago were repeatedly invoked to remind employees of Overnite's aversion to unionization. Overnite supervisors asserted that unionization would cause Overnite to lose customers, go out of business and "shut the doors," and that the Union would jeopardize "jobs, . . . benefits — everything." *Id.* at 4. Additionally, Overnite's management made multiple threats against the Union, including loss of benefits, imposition of stricter discipline and work rules, along with more onerous working conditions. Overnite also engaged in an unlawful crackdown on union activities at each of the four service centers, including threats of retaliation, unlawful surveillance of union activities, the stifling of conversations among pro-union employees, and unlawful restrictions on the use of company bulletin boards.

4.

The en banc majority does not dispute that Overnite was guilty of this litany of unfair labor practices, and it readily concedes that Overnite's misconduct dissipated the Union's majority at the Lawrenceville, Louisville, Norfolk, and Bridgeton service centers. *Ante* at 27. However, again ignoring the deference the Board is due, the majority concludes that Overnite's conduct did not warrant the *Gissel* bargaining orders. It chooses to focus on four asserted "mitigating factors" to support its position: (a) Overnite's lack of continuing misconduct; (b) the rate of employee turnover; (c) the passage of time; and (d) that fair elections were held at other Overnite service centers. As explained below, the majority's reliance on these factors is misplaced.

a.

First of all, the majority maintains that Overnite's unfair labor practices ceased in mid-1995. To the contrary, there is ample evidence that Overnite continued to engage in severe and pervasive violations of the Act in 1996 and 1997, after Overnite and the Union had partially settled their differences in July 1995. The following exam-

ples support this point:

! In December 1995, Overnite circumvented the Union
and proposed its annual wage increase, coupled with a
productivity agreement, directly to the unionized
employees. By its supervisor's own admission, Overnite
intentionally sought to avoid bargaining with the Union
about the wage increase and productivity agreement.

! In spite of the fact that Overnite had a sixteen-year prac-
tice of awarding annual wage increases to its employees,
it awarded the January 1996 wage increase in a discrimi-
natory manner, to non-union employees only.

! Following its discriminatory January 1996 wage
increase, Overnite flaunted its conduct by distributing
anti-union campaign flyers asserting that non-union
employees were being paid more than union employees,
and further contending that "voting for the Teamsters
presented serious, adverse consequences." *Overnite*, 329
N.L.R.B. at 60.

! In preparation for the hearing before the ALJ in May
1996, Overnite's attorneys engaged in coercive question-
ing of employees at the Louisville service center.

! In 1997 Overnite again publicized its wage discrimina-
tion against the union employees. As the ALJ explained,
"[a]dditional flyers, apparently issued after Respondent
increased wages *in 1997*, called attention to the fact that
the nonunion employees earned 95 cents more than those
represented by the Teamsters." *Id.* at 60 n.103 (emphasis
added).

In sum, this voluminous record contains unequivocal evidence to sup-
port the Board's finding that, well after the partial settlement, Over-
nite continued its anti-union activities and engaged in additional
violations of the Act.

b.

The majority's second basis for refusing to enforce the *Gissel* bargaining orders is that the Board failed to properly consider the rate of employee turnover occurring after the original elections. In point of fact, however, the Board did consider the issue of employee turnover, and it specifically found that "[i]n the present case, even accepting, arguendo, the facts asserted by [Overnite] concerning employee turnover, *we find the effects of [Overnite's] unlawful conduct are not likely to be sufficiently dissipated by turnover to ensure a free second election.*" *Overnite*, 329 N.L.R.B. at 5 (emphasis added). The Board went on to explain that the employee turnover rate did not undermine the *Gissel* bargaining orders, observing that a substantial majority of employees continued to be employed by Overnite, and that they would recall its coercive and impermissible actions.[4] *Id.*

Under applicable law, there is no specific threshold rate of employee turnover that renders a *Gissel* bargaining order impermissible. Moreover, if such a threshold rate existed, it would not be implicated in this case. When the bargaining orders were issued, between sixty and seventy percent of the Overnite employees who were exposed to its earlier campaign of unfair labor practices continued to work at the four service centers. And the courts have frequently upheld *Gissel* bargaining orders in the face of higher turnover rates. For example, in *NLRB v. So-Lo Foods*, 985 F.2d 123, 128-29 (4th Cir. 1992), we upheld a bargaining order in which the turnover rate was seventy-three percent. *See also Amazing Stores, Inc. v. NLRB*, 887

_____

[4] The majority asserts that the Board's conclusion on turnover impermissibly relied on what is called the "lore of the shop," i.e., employees' tales of past employer misconduct, and therefore it did not adequately consider the turnover issue. *Ante* at 28 n.4. The Board, however, made clear that it relied on factors other than the "lore of the shop" in reaching its conclusion that employee turnover failed to mitigate Overnite's misconduct. In fact, while specifically rejecting the concept of "lore of the shop" as speculative, Board Member Hurtgen concurred with the major-

ity that the turnover rate was not a sufficiently mitigating factor. Member
Hurtgen instead noted that the disparity in treatment between union and
non-union employees at Overnite, e.g., with respect to wages, was suffi-
cient to render the turnover rate inconsequential. *Overnite*, 329 N.L.R.B.
at 5 n.25.

64

F.2d 328, 330-31 (D.C. Cir. 1989) (upholding bargaining order despite ninety-five percent turnover); *NLRB v. Gordon*, 792 F.2d 29, 34 (2d Cir. 1986) (enforcing bargaining order after one-hundred per-cent turnover); *Action Auto Stores, Inc.*, 298 N.L.R.B. 875 (1990), *enforced* 951 F.2d 349 (6th Cir. 1991) (issuing bargaining order where there was seventy-five percent turnover).

Although, not unexpectedly, there was some turnover of employees at the four service centers, the Board carefully assessed this factor in light of Overnite's overall anti-union conduct. It then determined that, based on the record and its expertise, the *Gissel* bargaining orders should issue. As such, the majority's attribution of error to the Board on the factor of employee turnover is misplaced.

c.

The majority also places emphasis on the asserted "passage of time" between Overnite's unfair labor practices and the *Gissel* bar-gaining orders, concluding that there was nearly a five-year gap. The majority's analysis, however, which is premised on its conclusion that Overnite's anti-union activity ended in July 1995, is flawed. In fact, Overnite engaged in unfair labor practices in late 1995 and early 1996 when it (1) circumvented the Union; (2) awarded its discriminatory wage increase to non-union employees only; and (3) distributed cam-paign flyers blaming its discriminatory conduct on the Union. Fur-thermore, the ALJ found that this coercive behavior continued in 1997 when Overnite circulated additional flyers calling attention to the fact that "nonunion employees earned 95 cents more than those represented by the Teamsters." *Overnite*, 329 N.L.R.B. at 60 n.103. The very next year, in April 1998, the ALJ issued its Decision detail-ing Overnite's anti-union activity and recommending issuance of *Gis-sel* bargaining orders. By that time, the ALJ had conducted its evidentiary hearing in this complex case, and it had reviewed thou-sands of pages of exhibits and more than 14,000 pages of hearing transcripts. *Id.* at 6. In these circumstances, the passage of a single year's time is hardly excessive. Moreover, if we were to compute the passage of time based on the date of the Board's Decision and Order (November 1999), rather than the ALJ's Decision, the lapse

(from
1997 to November 1999) would be less than three years.

As with the employee turnover rate, there is no threshold time lapse after which issuance of a *Gissel* bargaining order by the Board is legally impermissible. Any undue lapse of time is simply another factor for the Board to consider in applying its expertise. It is true, of course, that in some circumstances, a time lapse may be sufficient to preclude a fair election. *See Be-Lo v. NLRB*, 126 F.3d 268, 282 (4th Cir. 1997) ("It strains credulity to believe that Be-Lo's unfair labor practices, such as they were, had such long-lasting effects that a fair rerun election could not have been held four years later . . . ."). However, the courts have routinely enforced bargaining orders involving time lapses longer than the one in this case. For instance, in *So-Lo Foods*, we enforced a *Gissel* bargaining order issued three-and-a-half years after assertion of the unfair labor practices. *So-Lo Foods, Inc.*, 303 N.L.R.B. 749, 750 (1991), *enforced*, 985 F.2d 123 (4th Cir. 1992). *See also NLRB v. Intersweet, Inc.*, 125 F.3d 1064, 1068 (7th Cir. 1997) (explaining that period of "just over three years . . . between the time of the violations and the imposition of the *Gissel* order" did not render bargaining order unenforceable because it was "ordinary institutional time lapse[ ] inherent in the legal process") (internal quotations and citations omitted). In light of Overnite's anti-union activities and the other relevant aspects of this case, the Board reasonably found that the time lapse did "not approach the time found to render the *Gissel* orders stale in some cases." *Overnite*, 329 N.L.R.B. at 6.

### d.

The majority's final point in justifying its view on the bargaining orders is that "fair reelections were found to have been conducted at several other sites which were similarly influenced by Overnite's unfair labor practices." *Ante* at 29. Significantly, both the Board and the ALJ also fully considered this factor; they nevertheless concluded that, in the circumstances, *Gissel* bargaining orders were warranted at Lawrenceville, Louisville, Norfolk, and Bridgeton. *Overnite*, 329 N.L.R.B. at 6 n.26, 63. Reviewing the Board's choice of remedy for abuse of discretion, as we must, I entirely agree with the Board.

The Union's ability to prevail in isolated elections at other facilities
does not mean that fair elections would occur at Lawrenceville, Lou-
isville, Norfolk, and Bridgeton. In point of fact, we do not know why

66

employees at the other facilities voted for the Union. We could specu-
late (although it is improper to do so): perhaps the unfair labor prac-
tices at those locations were not as severe as these, or perhaps a
distinct set of employee concerns propelled the Union to success. Put
simply, a myriad of factors could explain why the Union succeeded
at the other service centers.

Our job is not to guess what might have occurred at the other ser-
vice centers. Instead, our task is to review the extent and impact of
the unfair labor practices that occurred at Lawrenceville, Louisville,
Norfolk, and Bridgeton, and then to assess, under the applicable legal
principles, the propriety of the *Gissel* bargaining orders. The litany of
anti-union activity at those four locations, recounted *supra* at 51-62,
coupled with Overnite's national violations of the Act, provide ample
support for their issuance.

5.

In addition to maintaining that fair elections were possible at
Lawrenceville, Louisville, Norfolk, and Bridgeton, the majority faults
the Board for having insufficiently detailed its findings in support of
the *Gissel* bargaining orders. We have indicated that when the Board
issues *Gissel* bargaining orders it must make a "`detailed analysis' of
the `continuing effect of misconduct, and the potential effectiveness
of ordinary remedies . . . .'" *Be-Lo*, 126 F.3d at 282 (quoting *NLRB
v. Appletree Chevrolet, Inc.*, 608 F.2d 988, 997 (4th Cir. 1979)). The
rationale underlying this directive is that, in order to enable us to
assess whether a bargaining order is warranted, the Board must pro-
vide us with an adequate record.

And in this case, the record is more than adequate. The Board care-
fully analyzed Overnite's continuing misconduct and the relevant
related factors, and it also considered the inadequacy of ordinary
available remedies. It then issued its Decision and Order reiterating
the meticulous and exhaustive Decision of the ALJ. In so doing, the
Board observed that "[b]ecause this case falls within category II, we
have, as mandated by the Supreme Court in *Gissel*, examined the
extensiveness of the Respondent's unfair labor practices and the like-

lihood of their recurrence in the future." *Overnite*, 329 N.L.R.B. at 2.

By way of example, the Board thoroughly examined the "compliance

67

program" which Overnite had supposedly instituted to avoid future
unfair labor practices, and it determined that Overnite's compliance
program had been a failure. *Id.* at 4. The Board also made specific
findings that (1) Overnite had engaged in severe and pervasive hall-
mark violations of the Act, (2) the violations could not be remedied,
and (3) the violations would not be dissipated by employee turnover.
*Id.* at 5-6. Thus, in issuing its *Gissel* bargaining orders, the Board
carefully assessed the likelihood of recurring unfair labor practices
and the efficacy of ordinary remedies. As such, it has provided us
with a detailed record for our review and assessment of its *Gissel* bar-
gaining orders.

The Supreme Court's unanimous decision in *Gissel* clearly articu-
lated the role of bargaining orders in remedying unlawful election
activity, and in deterring future anti-union misconduct. As the Court
observed:

> If an employer has succeeded in undermining a union's
> strength and destroying the laboratory conditions necessary
> for a fair election, he may see no need to violate a cease-and
> desist order by further unlawful activity. The damage will
> have been done, and perhaps the only fair way to effectuate
> employee rights is to re-establish the conditions as they
> existed before the employer's unlawful campaign.

*Gissel*, 395 U.S. at 612.

This very proceeding presents the scenario envisioned by the Court
in *Gissel*. Faced with Overnite's egregious violations of the Act, the
Board concluded that bargaining orders were warranted at the four
contested service centers, and it issued them. Informed as it was by
the Board's unique expertise and by the exhaustive findings of the
ALJ, the Board's Order was entirely appropriate, and we should
enforce it.

I respectfully dissent, and I am pleased to state that Judge Michael
and Judge Motz concur in this dissenting opinion.

68